THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
*v.* CARLTON BLANCHARD *ET AL.*, DEFENDANTS, AND
CLAYTON ANDERSON, DEFENDANT-APPELLANT.

Argued January 19, 1965—Decided March 1, 1965.

*Mr. Jerome C. Eisenberg* argued the cause for the defendant-appellant, Clayton Anderson (*Mr. Stuart L. Pachman* and *Mr. Jerome C. Eisenberg*, on the brief).

*Mr. Philip R. Glucksman*, Assistant Prosecutor, argued the cause for the plaintiff-respondent (*Mr. Brendan T. Byrne*, County Prosecutor of Essex County, attorney).

The opinion of the court was delivered by

PROCTOR, J. The appellant, Clayton Anderson, and five codefendants, Carlton Blanchard, Percy Edmonds, Clyde Hightower, Billy Green, and Jesse Williams, were jointly tried in the Essex County Court for first degree murder. The jury acquitted three, Edmonds, Hightower, and Williams. The jury found two others, Blanchard and Green, guilty with a recommendation of life imprisonment. Anderson was found guilty without a recommendation of life imprisonment and was sentenced to death. Anderson, the sole appellant here, appealed to this court as of right pursuant to *R. R.* 1:2–1(c).

On the night of May 9, 1963, the body of James Dodd was found in the hallway at 405 Hunterdon Street, Newark. The blade of a knife protruded from his back. An autopsy revealed that he had died as the result of a stab wound in his chest. Four of the defendants were apprehended within three weeks of the crime. Anderson was arrested in Baltimore, Maryland, on November 30, 1963. Green was arrested in Newark on March 3, 1964. Shortly after each defendant was arrested he gave a detailed statement to the police admitting his presence in Anderson's automobile and describing the events leading up to and after the stabbing of Dodd.

The State's theory, at the trial of the six defendants, was that Dodd had been killed while the defendants were acting in concert to rob him. The State introduced into evidence the written statement of each defendant. Police officers also testified to oral admissions which several of the defendants had made at the time of their arrests and interrogations. When the State sought to introduce into evidence the statements of Anderson's codefendants, Anderson's counsel objected because the statements implicated Anderson. The trial court overruled the objection. It held that the statement of each declarant was admissible against him alone and that a proper instruction to the jury to that effect was all that was required. Each statement was subsequently read by the prosecutor to the jury and the trial court cautioned the jury that the statement was only evidentiary against the defendant who made the statement. In its charge the trial court again cautioned the jury as to the restricted use of each defendant's statement. The written statements were exhibits which were submitted to the jury for their consideration during deliberation.

On this appeal, Anderson argues that the introduction into evidence of the five written statements of his codefendants, all of which contained incriminating references to Anderson, was error since the jury could not have been expected to heed the trial court's limiting instructions. Further, he contends that the error was compounded by the repetitious emphasis upon the statements at the trial.

■ It is, of course, undisputed that the out-of-court confessions of the codefendants were inadmissible against Anderson. The inadmissibility of such evidence is not predicated merely upon the rule prohibiting hearsay but also upon the fundamental right of every defendant to confront the witnesses against him.

Courts have long recognized that the admission of one defendant's confession in a joint trial has the potentiality of prejudice to other defendants implicated by the confession.[1] Our courts have nevertheless upheld the admission of such statements. *E. g., State v. Rios*, 17 *N. J.* 572, 583–86 (1955); and *State v. Murray*, 33 *N. J.* 393 (1960). In allowing their admission we have recognized the potentiality for prejudice to a codefendant by requiring the trial court to make "a prompt

[1] In fact, a number of judges believe that the admission of a codefendant's confession which inculpates the defendant has not only the potential of prejudice to him, but prejudice as a virtual certainty which no limiting instructions no matter how frequently or forcefully charged can erase from the minds of the jurors.

See Judge Learned Hand's comments in *Nash v. United States*, 54 *F.* 2d 1006, 1007 (2 *Cir.* 1932) ("[T]he recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else.") ; *United States v. Gottfried*, 165 *F.* 2d 360, 367 (2 *Cir.* 1948) ("Nobody can indeed fail to doubt whether the caution is effective, or whether usually the practical result is not to let in hearsay.") ; and *United States v. Delli Paoli*, 229 *F.* 2d 319, 321 (2 *Cir.* 1956) ("[I]t is indeed very hard to believe that a jury will, or for that matter can, in practice observe the admonition. Possibly it would be extreme to say that nobody can ever so far control his reasoning that he will not in some measure base his conclusion upon a part of the relevant evidence before him, which he has been told to disregard; but at least it is true that relatively few persons have any such power, involving as it does a violence to all our habitual ways of thinking.").

In *Krulewitch v. United States*, 336 *U. S.* 440, 453, 69 *S. Ct.* 716, 723, 93 *L. Ed.* 790, 799 (1949), Justice Jackson said, "[T]he naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction."

See also the dissenting opinion of Justice Frankfurter in *Delli Paoli v. United States*, 352 *U. S.* 232, 246, 77 *S. Ct.* 294, 302, 1 *L. Ed.* 2d 278, 288 (1957) ; Judge Frank dissenting in *Delli Paoli, supra*, 229 *F.* 2d, at *p.* 322; *People v. Lombard*, 4 *A. D.* 2d 666, 168 *N. Y. S.* 2d 419 (*App. Div.* 1st *Dept.* (1957) ; *People v. Krugman*, 44 *Misc.* 2d 48, 252 *N. Y. S.* 2d 846 (*Sup. Ct.* 1964).

and emphatic caution to the jury as to the limited evidential effect to be given" to the confession of a codefendant. *State v. Murray, supra,* at *p.* 398.[2] More recently, in *State v. Tassiello,* 39 *N. J.* 282 (1963), this court recognized the likelihood of prejudice but stated:

"Nevertheless, it is generally recognized that considerations arising out of the due administration of criminal justice frequently require that several defendants be tried jointly and that the confession of one defendant be admitted into evidence at such a joint trial where the circumstances are such that the jury can reasonably be expected to follow the court's admonition to disregard the confession as to the other defendants." *Id.,* at *p.* 296.

Implicit in the statement quoted above is the recognition that the jury in some cases may not reasonably be able to follow the trial court's instructions. See also *State v. Manney,* 26 *N. J.* 362, 370 (1958). In *Delli Paoli v. United States,* 352 *U. S.* 232, 243, 77 *S. Ct.* 294, 300, 1 *L. Ed. 2d* 278, 286 (1957), the United States Supreme Court also recognized that there may be situations where limiting instructions would be ineffective.[3]

---

[2] It has been said that even where declarations are carefully and clearly limited by the court at the time of their admission, in most instances the application of the rule places a heavy burden on the jurors to keep in mind to whom the declarations have been restricted. *Lutwak v. United States,* 344 *U. S.* 604, 619, 73 *S. Ct.* 481, 490, 97 *L. Ed.* 593, 604 (1953).

[3] "[W]hen several conspirators are jointly tried, a confession, while it will be admitted against the declarant, is not admissible against his codefendants under the rule. However, the fact that it is admitted at all, in a joint trial, creates the possibility of prejudice if the confession in any way suggests the guilt of codefendants. The general rule is that although there may be some prejudice, it is not reversible error to admit a confession, as long as it is accompanied by an admonition to the jury to disregard it as to the other defendants. However, the admonition has been characterized as 'ritualistic,' and many courts recognize that it is impossible for a juror completely to disregard evidence he has heard. Until recently, the Supreme Court followed the general rule. However, in *Paoli v. United States,* the Court, while holding that such an admission in evidence of a confession is not *per se* prejudicial, based its decision on the conclusion that under the circumstances of the case the jury could be considered to have followed the instructions. The implication of the case seems to be that despite

██ The issue before us, therefore, is whether in the circumstances of this case the jury could reasonably be expected to follow the trial court's admonitions to disregard the out-of-court statements of Anderson's codefendants in their determination of Anderson's guilt and punishment.

The stories which the five codefendants told in their statements were similar as to Anderson's part in the crime. They all stated that they had joined Anderson at one time or another during the day and evening of May 9, 1963. They drove around the streets of Newark in Anderson's car and stopped at a number of bars. At about 10:00 P. M. they drove by a bar and saw the bartender drag a drunken man, later identified as the victim Dodd, across the street and put him on a park bench. Anderson, who was driving, stopped the car and he and Green got out and brought Dodd back to the car and put him in the rear seat.

All but Green stated that Anderson went through Dodd's pockets and took his wallet and wrist watch. All said that Anderson drove the car to Hunterdon Street; that Anderson stopped the car and dragged Dodd from the rear seat. All but Williams said they saw Anderson stab Dodd.

Each defendant in his statement minimized his own part in the crime and implied that he was a mere bystander when Anderson abducted, robbed, and stabbed Dodd. All the statements contained the common theme that Anderson was the leader, the instigator, the robber, and the killer.

All of the codefendants' statements were taken by the police in question and answer form. All contain a lengthy narrative

---

an instruction to disregard the confession as to other defendants there may be factual situations in which its admission would be prejudicial. Prejudicial error might occur in large conspiracy trials in which there are several confessions, each admissible as to only one defendant. While it has been contended that the judge must either refuse to admit a confession or order a severance, the view taken in *Paoli* seems preferable, since it recognizes the necessity of weighing the interest in admitting the confession as to the declarant in a joint trial against the policy of avoiding prejudice to codefendants." Note, "Developments in The Law, Criminal Conspiracy," 72 *Harv. L. Rev.* 920, 990 (1959).

description of the sequence of events leading up to the stabbing of Dodd. Anderson is inculpated by name over 150 times. Not only do the answers of each defendant incriminate Anderson, but the police in their questioning assumed that Anderson had robbed and stabbed Dodd. The prejudicial references to Anderson are too numerous to set out in detail. It is enough to give some examples from the statements of each of the codefendants.

When Blanchard was asked why he thought Anderson was responsible for the stabbing of Dodd, he replied: "Because I seen him do it." He also said that when the defendants first spotted Dodd on the park bench Anderson said, " 'Let see if he got any money.' "; that when the car was stopped Anderson "walked around the back of the car and he opened the back door of the car and started stabbing at the guy."

In his statement, Hightower said in response to a question as to what caused Dodd's death: "All I know is he was stabbed, Clayton [Anderson] stabbed him." He also quoted Anderson as saying when Dodd was in the car, " 'I wonder if he's got anything.' " Hightower said that when the group arrived at Hunterdon Street, the following occurred:

"Clayton said to everybody in the car 'don't bother with this man because he's my man tonight.' And then Clayton stopped the car and he jumped out of the driver's seat and walked around the back of the car and he opened the rear door and he snatched the man out of the car and he went through the man's pockets and I saw him take the man's watch and he took some small change out of the guy's pockets and then Clayton grabbed the guy by the collar and started stabbing at him with a knife."

In Edmonds' statement the following colloquy took place:

"Q. Who stabbed Joseph Dodd?
A. Calvin Anderson.
Q. How do you know:
A. I was there in the car.
\* \* \* \* \* \* \* \*
Q. Then what happened?
A. He parks the car right by Diamond Junk Yard right on Hunterdon St. Calvin [Anderson] gets out of the car on his side and he asks Collie [Blanchard] for his knife and Collie gave it to him. Calvin

walks around and opens up the back door by the curb and drags the man out and he then started stabbing the man * * *

Q. How many times did Calvin stab the man?

A. I couldn't count them but he hit him about three or four times."

In his statement Williams said:

"I told him that I was clean and that I didn't want to get in any trouble, Calvin [Anderson] told me to shut up he said that when I fight he doesn't tell me how to fight. Calvin then drove over to Hunterdon St. and parked the car. Calvin then said that he was going to get rid of him and he got out of the car. He went up to Collie [Blanchard] and said to him let me see your knife and Collie handed him his knife. Calvin then walked around to the other side of the car and he and Billy Green pulled the guy out the car and started beating him. When Calvin and Billy got back in the car I could hear the other guy yelling then Calvin drove off."

Green's statement contains the following:

"[T]hen Anderson stopped the car, got a knife from some one in the back seat, came and opened the door and started pulling this guy, he took off the park bench, out of the car. I got out of the car because I was sitting next to the door and he was pulling this guy across me. He got the guy out of the car, I can't remember anyone saying anything, then I saw Anderson stab the guy in the back two times get back into the car and as we were driving away Anderson said, 'Now why you all let me do that for.'"

Not only were the statements of the codefendants read to the jury by the prosecutor but they were also quoted extensively by the prosecutor during his summation and were given to the jury as exhibits. Moreover, several police officers testified to oral statements made by the codefendants which inculpated Anderson.

In his statement Anderson told the following story: He said that while he was driving the car Hightower spotted Dodd; that he (Anderson) and Green put Dodd in the back seat; that Hightower went through Dodd's pockets and the two scuffled. When the car stopped on Hunterdon Street, Dodd rolled out of the car and Hightower shouted that Dodd had a knife. Green jumped out after Dodd and he (Anderson) followed. When he got to the other side of the car, Green was standing over Dodd with a knife in his hand,

which Anderson snatched away. Then when Dodd was standing in front of him, Anderson, remembering Hightower's warning that Dodd had a knife, stabbed Dodd once in the left side and the knife broke. Anderson said that the following day Hightower traded a watch to him for a pair of pants and that he pawned the watch later that day. When asked by the police why he stabbed Dodd, he answered: "I don't know unless I just got panicky when he came on top of me."

At the trial Anderson repudiated his statement, explaining that the police had obtained it from him by suggesting the answers from the other defendants' statements and by subjecting him to a severe physical beating. He testified in his own defense and said that he was drunk from the early part of the evening and remembered nothing until after midnight. (This was some time after Dodd had been stabbed.) Green and Williams also took the stand and as to Anderson testified substantially in accord with their written statements. Blanchard, Hightower, and Edmonds did not testify.

Other than the statements of the defendants, the State produced no evidence that Anderson was the defendant who stabbed Dodd. The only two eyewitnesses to the crime could not identify the attackers.

Under the above circumstances, we are convinced that it was psychologically impossible for the jury to isolate and ignore the evidence which was inadmissible against Anderson in determining his guilt and the penalty he should suffer.

*Delli Paoli, supra,* relied upon by the State, is distinguishable. There, in a joint trial of five defendants for conspiracy to deal in illicit alcohol, the confession of only one of the codefendants was admitted in evidence. This confession inculpated the appellant Paoli. The United States Supreme Court, in a 5-4 decision, held that the codefendant's confession was properly admitted and affirmed Paoli's conviction. The majority was careful to point out a number of factors which favored its conclusion that the jury could have reasonably been expected to follow the trial court's limiting instructions. Among them were the following: First, since only one con-

fession was involved there was no multiplicity of evidentiary restrictions. Second, the trial court postponed the introduction of the confession until the rest of the government's case was in evidence. And at the time of the admission of the confession the trial court instructed the jury as to its limiting effect and pointed out that it had separated the confession from the other evidence to aid in its limited consideration. Third, the confession merely corroborated what the government had previously established by uncontradicted testimony implicating Paoli in the conspiracy (Paoli apparently did not testify) and therefore, the references to him were cumulative.

By contrast, in the present case there was not one but six confessions for the jury to consider, each admissible only against the declarant. And there were oral admissions by several of the codefendants admissible only as to them. The confessions of the defendants were the core of the State's case and, after their introduction, were repeatedly referred to throughout the trial. The confessions of the codefendants can in no way be said to be merely cumulative. In the absence of the confessions, as mentioned earlier in this opinion, the State produced no evidence that Anderson was the defendant who stabbed Dodd. His mere presence in the automobile might not have been sufficient to satisfy the jury of his guilt. It must be remembered that on such evidence the jury acquitted Edmonds, Hightower, and Williams.

In *State v. Rios, supra,* four defendants, after a joint trial, were convicted of a robbery murder. The proprietor of a luncheonette had been shot by one of the robbers in the presence of seven patrons. All the defendants confessed and the confessions were admitted in evidence with appropriate limiting restrictions. This court affirmed their convictions, holding that the trial court did not abuse its discretion in denying a severance, and said:

"We are confident that no abuse of discretion was committed in denying the motions for a severance. This is not a case in which each defendant insisted the other defendant did the actual killing. There is no dispute in that regard. Rios is the one who pulled the trigger, and

the fundamental facts are not disputed except as to a phase of direction and compulsion sought to be inserted by Rios.

\* \* \* \* \* \* \*

The cases cited and relied upon by defendant Rios in his brief do not support his position. In *Day v. State*, 196 *Md.* 384, 76 *A. 2d* 729 (*Ct. App.* 1950), a severance was directed where each of the two defendants on trial had made statements accusing the other of having committed the crime, the court noting that it would be practically impossible for the jurors to dismiss from their minds the cross-accusatory statements. As we have already noted, there was no such dispute here. It was conceded by all that Rios had fired the fatal shots." *Id.*, 17 *N. J.*, at *pp.* 585–586.

Moreover, in addition to the confessions, the State produced 32 witnesses connecting the defendants with the crime, including eight eyewitnesses to the robbery and shooting. In the present case, there was a substantial controversy over the part each defendant played in the perpetration of the crime. And more significantly, Anderson, on the stand, repudiated his confession and denied that he had robbed or stabbed the victim. Furthermore, unlike *Rios,* this crime took place on a darkened street and the only eyewitnesses produced by the State were unable to identify the assailants.

In *State v. Murray, supra,* two brothers were jointly tried for theft. The confession of one, which implicated the other, was admitted in evidence. Under these circumstances, it was relatively simple for the jury to segregate the confession from the rest of the evidence.

In the present case the jury had, in addition to determining Anderson's guilt, the delicate task of deciding if he should live or die. The quotations from the codefendants' statements set forth above not only indicated Anderson's guilt but made him out to be a cold-blooded, bestial, and vicious killer. Even if we consider the evidence of Anderson's guilt to be overwhelming, so that the codefendants' statements were cumulative and therefore probably of slight weight in the jury's determination of his guilt, we could not say with any confidence that the codefendants' statements played but an insignificant role in the jury's determination that Anderson should receive the death penalty.

 We are not unmindful of the fact that Anderson did not move for a severance at any time prior to or during the trial. Failure to make such a motion is a factor to be considered in weighing defendant's right to a reversal. *Delli Paoli, supra,* 352 *U. S.,* at *p.* 241, 77 *S. Ct.,* at *p.* 299, 1 *L. Ed. 2d,* at *p.* 285; *State v. Murray, supra,* 33 *N. J.,* at *p.* 396. However, such failure should not *per se* preclude us from reversing where we are convinced that the statements of the codefendants could not help but weigh heavily in the determination of Anderson's guilt and penalty.[4] We therefore conclude that Anderson is entitled to a new trial.[5]

As the case must be retried, it is appropriate for us to consider Anderson's remaining ground for reversal. Anderson contends that the admission of his confession violated his Fifth Amendment right to freedom from testimonial compulsion and his Sixth Amendment right to counsel. He argues that prior to the taking of his statement, the police did not advise him of his right to counsel and he was not effectively warned that anything he might say could be used against him.

All the defendants were indicted on July 23, 1963. Anderson was arrested in Baltimore, Maryland, on November 30, 1963. He was questioned in Newark on December 4, 1963, when he made oral admissions and a later written statement.

---

[4] See Comment, "Post-Conspiracy Admissions in Joint Prosecutions —Effectiveness of Instructions Limiting the Use of Evidence to One Co-Defendant," 24 *U. Chi. L. Rev.* 710 (1957).

[5] At the time the State sought to introduce the statements of Anderson's codefendants, Anderson's counsel, in addition to objecting to their admission, sought to have the references to Anderson deleted. He offered for the trial court's consideration copies of the codefendants' statements indicating suggested deletions. The prosecutor objected, arguing that the deletions would destroy the sense of the statements as to the declarants. The trial court agreed. We have examined the proffered statements with the suggested deletions and agree that the deletions would have been impractical. Compare *Delli Paoli v. United States,* 352 *U. S.* 232, 237, 77 *S. Ct.* 294, 297, 1 *L. Ed.* 2d 278, 282–283 (1957) ; *State v. Murray,* 33 *N. J.* 393, 397–398 (1960). Of course, where deletions can be made without substantially impairing the contents of a statement, they should be made. See *State v. Ravenell,* 43 *N. J.* 171, 183 (1964) ; and *State v. Young,* 86 *N. J. Super.* 262 (*App. Div.* 1965).

At the trial Anderson's attorney objected to the admission of the statements. After hearing the testimony of the police officers who questioned Anderson, the trial court found, *inter alia*, that before his written statement was taken Anderson was told that the statement could be used against him. The trial court also found that no one had told Anderson that he had a right to the advice of counsel. But the trial court held that these facts of themselves did not render the statements involuntary. Considering all the evidence before it, including the lack of advice to Anderson as to his rights, and his claim of mental and physical coercion, the court decided his statements were voluntary and therefore admissible.[6]

In support of Anderson's argument that his confession was inadmissible, he cites the recent cases of *Escobedo v. State of Illinois*, 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964), and *Massiah v. United States*, 377 *U. S.* 201, 84 *S. Ct.* 1199, 12 *L. Ed. 2d* 246 (1964). In *Escobedo*, the defendant had already retained counsel and had made repeated requests to see him. His confession was made only after his requests had been denied. The United States Supreme Court held that the refusal of the accused's requests to consult with counsel, coupled with the failure to warn him of his right to remain silent, amounted to a denial of the assistance of counsel as guaranteed by the Sixth Amendment. In the present case, Anderson had not retained counsel and admittedly made no affirmative request for assistance of counsel. We have held that *Escobedo* does not apply in such a situation. *State v. Smith*, 43 *N. J.* 67, 83 (1964). Jurisdictions which have considered factual situations similar to the present one are divided as to whether such situations are distinguishable from *Escobedo*. Compare *Bean v. State, Nev.,* 398 *P. 2d* 251 (*Sup. Ct.* 1965); *People v. Hartgraves*, 31 *Ill. 2d* 375, 202 *N. E. 2d* 33 (*Sup. Ct.* 1964); *Jackson v. United*

---

[6] On this appeal, Anderson does not predicate his claim of the inadmissibility of his statements on the alleged physical or mental coercion. His sole argument is that the absence of effective warning and advice as to his rights renders his statements inadmissible.

*States*, 337 *F. 2d* 136 (*D. C. Cir.* 1964); *People v. Agar*, 44 *Misc. 2d* 396, 253 *N. Y. S. 2d* 761 (*Sup. Ct.* 1964); with *People v. Dorado*, 40 *Cal. Rptr.* 264, 394 *P. 2d* 952 (*Sup. Ct.* 1964), affirmed on rehearing, 42 *Cal. Rptr.* 169, 398 *P. 2d* 361 (*Sup. Ct.* 1965); *State v. Neely*, 395 *P. 2d* 557 (*Or. Sup. Ct.* 1964).

In *Massiah*, the defendant had been indicted for violating the federal narcotics law. He had retained counsel, and had been released on bail. Federal agents concocted a scheme whereby Massiah's confederate, who had decided to cooperate with the government, induced Massiah, while in the confederate's car, to make incriminating statements. The agents had planted broadcasting equipment in the car and, with receiving equipment in another car, overheard Massiah's conversation. Massiah had no knowledge that what he was saying was being recorded by the agents. The court held that Massiah's incriminating statements could not be used against him in his subsequent trial. In his concluding statement in the *Massiah* case, Justice Stewart, speaking for the court, said:

"All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecutor as evidence against *him* at his trial." *Massiah, supra*, 377 *U. S.*, at *p.* 207, 84 *S. Ct.*, at *p.* 1203, 12 *L. Ed. 2d*, at *p.* 251 (Emphasis in the original)

Here Anderson's statements, though made at the time when he had no counsel, were made voluntarily in the known presence of the police officers. This distinction was sufficient in *State v. McLeod*, 1 *Ohio St. 2d* 60, 203 *N. E. 2d* 349 (1964), for the Ohio Supreme Court to distinguish *Massiah* and permit the introduction of a post-indictment statement. In view of the present uncertainty of the law, and in the absence of an express declaration of the United States Supreme Court delineating the scope of the principles announced in *Escobedo* and *Massiah*, we hesitate to depart from our previous holdings in *State v. Smith, supra*, and in *State v.*

*Pierce,* 4 *N. J.* 252 (1950), which held that a confession is not inadmissible solely because it is made without prior cautioning of the defendant. Therefore, in the absence of a clear expression to the contrary by the United States Supreme Court in the interim, Anderson's statements should be admissible, assuming the same circumstances exist at the subsequent trial as the record shows in this case.

The judgment of conviction is reversed and the cause is remanded for a new trial.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.