STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JOHN ROBERTS, JR., DEFENDANT-APPELLANT.

Argued March 22, 1966——Decided June 6, 1966.

*Mr. Henry J. Franzoni, Jr.,* argued the cause for appellant.

*Mr. Philip R. Glucksman,* Assistant County Prosecutor, argued the cause for respondent (*Mr. Brendan T. Byrne,* Essex County Prosecutor, attorney).

The opinion of the court was delivered

PER CURIAM. Defendant was indicted for the murder of Solomon Hutchins. The jury returned a verdict of manslaughter, and defendant appeals directly to us from the judgment of conviction. *R. R.* 1:2–1(c).

Hutchins and his wife ran a small grocery store on Prince Street in Newark. Defendant was one of several persons who on the day of the homicide played at cards with Hutchins in a room behind the store. Following a dispute between them, Hutchins ordered defendant to leave. Defendant did. Mrs. Hutchins testified it was then about 10:00 P. M.; that about 11:00 P. M. defendant returned to the store; that, hearing a commotion, she went to the front and saw her husband lying on the sidewalk with defendant striking down at her husband and her husband attempting to strike back with a wooden shovel handle. Hutchins died within a matter of minutes. He had been stabbed with an ice pick. There were four wounds, one in the left side of the chest to a depth of four inches, another in the right side of the lower abdomen to a depth of 5¼ inches, and two in the right side of the upper abdomen to a depth of about one inch.

The police arrived quickly and went with Mrs. Hutchins to search for defendant. Defendant was found at his home. He had injuries to his left hand, left elbow, and head. He explained to the police that he had fallen down a flight of stairs. He was removed to a hospital where it was found that the elbow was fractured. Upon his release from the hospital some 12 days later, he gave the police a written

statement in which he said that Hutchins had attacked him with a club, that in defense he spun Hutchins to the ground, and stomped on him with his foot. The statement was thus wholly exculpatory, but it hurt defendant because of the obvious conflict with the undisputed fact that Hutchins was stabbed.

At the trial defendant testified that as he left the store, Hutchins suddenly belabored him with the shovel handle; that reaching for a knife he in fact did not have on him, he felt and drew an ice pick which he had found a week before and had forgotten about; that he did not believe he stabbed Hutchins; that on his way home, he discarded the weapon. It was not found.

■ On this appeal, defendant complains of the admission of the oral statement to the police concerning how he was injured and of the admission of the written statement referred to above. Defendant also charges the prosecutor with alleged improprieties. We find no substance in any of these points. On the record of the trial, the conviction is in all respects proper and the judgment should be affirmed.

Defendant, however, raises for the first time upon this appeal a charge of racial bias. Defendant is a Negro and so also was the deceased. Counsel for defendant sought to inquire on *voir dire* whether the jurors held any prejudice against Negroes. His approach was quite indirect; he explained that he was trying to probe the "subjective state" of the juror's mind. The stenographic record, as certified by the shorthand reporter, reads in part:

"THE COURT: I cannot understand what difference it would make if he had any social relationship with a Nigger, or if he lives within three blocks of a Negro. How can that show prejudice? I cannot see any sense in that.

MR. FRANZONI: Your Honor, whether or not he has prejudice against Negroes in general is a subject matter that may be in his own mind.

THE COURT: I understand that, but the question of whether he has ever been to a socal occasion with a Negro or how close he happens to live to a Negro, it seems to me has very little, if anything, to do with it."

The complaint revolves about the word "Nigger." That word appears nowhere else in the record. We asked the trial judge to certify whether the transcript is accurate and he replied that he is morally certain that he did not use that word.[1] There was no objection by counsel at the trial, or thereafter when he made a motion for a new trial. The record repels any suggestion of prejudice. In fact, no other juror was present during the interrogation in question, and the juror then being examined was not seated in the case. The trial itself was completely fair. Indeed the trial court was most patient with the defense, which from time to time was unable or unwilling to abide by its rulings. The prosecution, too, handled the case commendably. We note, in support of that observation, that when defense counsel undertook to bring out defendant's criminal record and was about to elicit items which the State could not have introduced against defendant, the prosecutor intervened to protect defendant and the trial court too assisted the defense in that regard. The verdict itself was eminently fair; the evidence would have justified a finding that defendant went home to obtain the ice pick and returned to the store to renew the dispute with deceased, from which finding a higher degree of criminal culpability could readily emerge.

---

[1] His certification reads:

"I have received a request from the Court through Mr. Gildea to certify the accuracy of the quoted portion of the transcript of the voir dire in the case of State v. Roberts. I remember the case very well; I am morally certain that I did not utter the offensive word contained in the quoted portion of the stenographer's transcript. The word used, as is apparent from the context, was Negro.

It seems significant to note the absence of comment by counsel or anyone else either on or off the record. If the offensive word had been used, I am sure, in view of the tenor of the times, that someone would have called my attention to it.

In conducting trials, I have been keenly aware of the responsibility of a trial judge to establish an atmosphere reflecting the serious pursuit of impartial justice. I have always found personally distasteful the use of any ethnic appellation which carries with it a note of derision."

Although we are thus satisfied the record contains not a trace of prejudice, defendant claims he was so cut by the word that he despaired of a fair trial and lost his capacity to testify with conviction and effect.

As we have said, this claim was first advanced by an affidavit filed with our Court, executed some ten months after the trial. Obviously a claim of that kind can be advanced only at the trial level, and never by *ex parte* affidavit, for the State has the right of cross-examination. The affidavit being no part of the record before us, it should be ignored and defendant left to some further proceeding if he should wish to pursue his allegation.

We would take that course except for our doubt that the allegation could be tried with real satisfaction. We understand the stenographer stands by her notes, and we are certain of the integrity of the trial court's certification. The question then would be whether the stenographer's record reflects an unconscious slip of the judge's tongue or the error of the stenographer in hearing or in recording.[2] It would be awkward to resolve an issue of that kind. And if the stenographer's version were upheld, the trier of the facts would then have to deal with defendant's assertion of his alleged emotional reaction to the word. The record of defendant's testimony does not reflect the despair he now asserts. And it seems incredible that, if he was so deeply moved, he would have said nothing to his counsel at that time. His silence, as well as the silence of counsel, who was at that very moment

---

[2] Needless to say, stenographers do make mistakes. For example, the stenographer here concerned attributed the following to the trial judge during the *voir dire* of another prospective juror:

"As a matter of fact, the Federal Court practice allows for the attorneys to draft a *wish* to the Court to question the jurors and the Court asks the questions * * *."

Obviously the word "wish" is the reporter's mistake. The only noun that could make sense is "request." Thus we have a clear error even where there was no chance of a phonetic misunderstanding such as can readily arise if "Negro" is not enunciated distinctly. In the record we find also a mistake of that kind. We find "behavior of sciences" where obviously the speaker said "behavioral sciences."

searching for unconscious prejudice in a prospective juror, is difficult to comprehend. But we are in an area of great current sensitivity, and no matter how the courts deal with the issue, there may remain a doubt that the issue was handled objectively. For this reason, and although we are satisfied justice was done, we conclude, with much reluctance, that the image of justice would be better served by a new trial.

The judgment is reversed and the matter remanded for a new trial.

FRANCIS, J. (dissenting). Roberts was given a scrupulously fair trial. The proof of his guilt was clearly adequate. In fact, as the majority note, a verdict of a higher degree of criminal culpability could well have emerged.

The record fails to reveal the slightest indication of bias or prejudice or unfairness on the part of the presiding judge, in his conduct of the trial, or treatment of witnesses, including the defendant.[1] I believe, as I am certain the trial judge does,

---

[1] In this most unusual situation, the public record of the trial judge should not be ignored by either State or defendant. It was established before the Roberts case in many criminal cases involving white and non-white defendants, and in many public activities. For hundreds of years lawyers and judges engaged in practicing and administering law, have been acutely aware of the probative strength of *ante litem motam* evidence. A few pertinent examples ought to be set out here.

In March and December 1965 this Court had occasion to review first degree murder convictions of non-white defendants arising out of a murder committed in Essex County on May 9, 1963. See *State v. Blanchard*, 44 N. J. 195 (1965) ; *State v. Green*, 46 N. J. 192 (1965). Trial of the case which ended on April 22, 1964 was conducted by Judge John F. Crane before whom Roberts was tried. During the drawing of the jury in *Blanchard* and *Green* an incident took place which is particularly revelatory of the Judge's attitude on the subject of racial bias.

A prospective juror was called and with the court conducting the interrogation the following took place:

"John Doe previously sworn.

BY THE COURT:

Q. Where do you live? A. * * *
Q. How long have you lived in * * *?
A. Twenty years.
Q. What is your occupation?

that justice should be administered equally to all persons regardless of race, creed or color. In my judgment in the guilt or innocence determining process the defendant was given the

A. Vice-president of * * *.
Q. What business are they in?
A. Social engravers.
Q. Where is your place of business?
A. * * * New York City.
Q. Do you know of any reason why you could not serve as a juror on this case?
A. Yes. I don't feel that I could be fair to the defendants in this situation in the light of all the activity that has taken place in the colored business in the last six months. Previous to that, I probably could.
Q. That has nothing to do with this case, you understand?
A. I understand the defendants are colored men.
Q. Yes, they are. They are seated over here.
A. I don't think I could be fair to them under the circumstances.
Q. Because of the integration movement that has been going on?
A. Not the integration movement, but the general attitude regarding law and order by those people.
Q. You feel that you might be prejudiced?
A. Definitely.

THE COURT: All right. You are excused, sir. I'm frankly shocked at your attitude, sir. It surprises me that a man of your stature in the business world has this attitude.

THE WITNESS: I think it's only fair to tell you if I have that feeling.

THE COURT: That's right. I must condemn the attitude. I must ask, however, that you try to search your conscience and decide.

THE WITNESS: That's the way I feel.

THE COURT: You had an obligation to reveal it. I will ask that you not discuss anything that was asked of you or any answer that you gave with any member of the jury panels. You may be—as a matter of fact, I think I will strike you from the jury rolls.

THE WITNESS: All right." (Name and address of juror omitted for obvious reasons.)

The *Nutley Sun* of May 28, 1963 highlighted on its front page an account of a memorial service for a young Negro sailor who went down with the submarine U. S. S. Thresher, April 10, 1963. The service featured an address by Judge John F. Crane.

On March 18, 1965, the same newspaper contained a front page article entitled "Aftermath of Selma. Civil Rights and Nutley." It featured an account and pictures of a freedom marchers' parade and rally at the Nutley Oval. The march and the meeting were designed as a public protest against the treatment of the Negroes and the freedom marchers in Selma, Alabama; particular protest was regis-

benefit of that principle in full measure by both court and jury. For my colleagues to reverse the resulting conviction

---

tered about the death of Reverend James J. Reeb, who was beaten fatally by "racist hoodlums" in Selma. In describing the march and rally the article said, among other things:

"Two other local officials, Commissioner Carl A. Orechio and Judge John F. Crane, participated in the march along the Chestnut Street—Passaic Avenue—Centre Street—Franklin Avenue route. * * *"

In the picture of the Oval rally Mrs. John F. Crane, wife of the Judge, appears in the front row.

The Montclair Times of March 18, 1965 contains a front page story entitled "Pastor Hits Segregation." It reports that on Sunday morning a capacity congregation of the Unitarian Church heard the minister pay tribute "to my beloved colleague in the Unitarian ministry, Rev. James J. Reeb, murdered in Selma, Ala., this past week." The account continued:

"At the close of the service, the members of the congregation formed three long lines before three tables to sign their names to a petition to President Johnson previously drawn up by the trustees of the church, Judge John F. Crane, president. A special offering was taken, half to go to the Reeb family and half to the Southern Christian Leadership Conference, headed by the Rev. Martin Luther King.

The petition to the President asked him to 'direct the Department of Justice to take all necessary action immediately, including the use of United States Marshalls, to ensure that such constitutional rights (freedom of speech, the right to assemble peaceably, to petition the government for redress of grievances and to vote) are guaranteed to all American citizens in Alabama and that persons guilty of depriving citizens of such rights be brought swiftly to the bar of justice.' * * *"

On April 8, 1965 the same newspaper carried a story entitled "Money Is Given For Civil Rights," headed by a picture of a Negro minister, a white minister of The Unitarian Church, and Judge John F. Crane. The picture footnote says:

"The Rev. D. C. Rice, president of the Clergy Club of Montclair, presents a $775 check for the Reeb family to Dr. Norman D. Fletcher, minister of the Unitarian Church, while Judge John F. Crane, president of the Unitarian Church looks on."

The article followed. It said:

"A check for $775 for the family of the Rev. James J. Reeb, the young Unitarian minister murdered recently in the civil rights struggle at Selma, Alabama, was presented to the Montclair Unitarian Church at the service Sunday at 11 A. M. by the Rev. D. C. Rice, Minister of Union Baptist Church and President of the Clergy Club of Montclair and vicinity. The check, 'a gift of love from the citizens, churches and synagogue of Montclair' was presented to Judge John F. Crane, president of The Unitarian Church, to be forwarded to the Reeb family.

when they find no error, is not to achieve equal justice for the defendant; it is to impose unequal justice on the trial judge.

For these reasons I would affirm the conviction.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL and SCHETTINO — 5.

*For affirmance* — Justice FRANCIS — 1.

---

Judge Crane announced that a contribution of $705 from The Unitarian Church would be combined with the check presented by Mr. Rice, making a total of $1480 to be sent to the Reeb family. The amount presented by Mr. Rice came largely from an offering taken at the mass meeting at Union Baptist Church on March 17 following the civil rights march from Trinity United Presbyterian Church on High St., to the Municipal Building, thence to Union Baptist Church.

Following this presentation, Judge Crane presented a check for $705 to Mrs. Bertha G. Edwards representing Dr. Martin Luther King's organization, the Southern Christian Leadership Conference. This contribution from the Montclair Unitarian Church represents half of an offering taken at the church, the other half being for the Reeb family."

It seems fair to say we are dealing here with a man to whom civil rights and equality are not just the catchwords of a principle, and with a judge to whom justice is not just a cloistered virtue; nor freedom a mere intellectual abstraction. Rather we are dealing with a judge who practices publicly what he professes privately.