922 A.2d 1210

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. DONALD LOFTIN, DEFENDANT–APPELLANT.

Argued October 31, 2006—Decided June 5, 2007.

174

177

*David B. Glazer* and *Michele A. Adubato,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney). *Dorothy A. Hersh,* Assistant Prosecutor,

argued the cause for respondent (*Joseph L. Bocchini, Jr.*, Mercer County Prosecutor, attorney).

*Dorothy A. Hersh,* Assistant Prosecutor, argued the cause for respondent (*Joseph L. Bocchini, Jr.*, Mercer County Prosecutor, attorney).

Justice ALBIN delivered the opinion of the Court.

Defendant Donald Loftin was convicted by a jury of the capital murder of Gary K. Marsh. In the penalty-phase proceeding before a separate jury, he was sentenced to death. This Court affirmed defendant's conviction and sentence on direct appeal, *State v. Loftin,* 146 *N.J.* 295, 318, 680 *A.*2d 677 (1996) (*Loftin I*), and upheld his sentence on proportionality review, *State v. Loftin,* 157 *N.J.* 253, 266, 724 *A.*2d 129 (*Loftin II*), *cert. denied,* 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.*2d 193 (1999).

Defendant now appeals to this Court from the denial of his petition for post-conviction relief (PCR), in which he claims that both his trial and appellate counsel were constitutionally ineffective. One issue raised in the PCR petition is of grave concern to us. During the early stage of defendant's guilt-phase trial, the court learned that a white juror had told two of his African–American co-workers that he was going to buy a rope to hang defendant. The juror's comments were made in a case involving an interracial killing—an African–American defendant was charged with murdering a white man. Accepting the juror's explanation that he had not predetermined defendant's guilt, the court declined to remove him from the panel and permitted him to sit with his fellow jurors until the conclusion of the trial, at which time he was designated an alternate juror. At no time did the trial court interview the remaining members of the panel to confirm that the juror did not communicate to them any preconceived notions of defendant's guilt.

There is no room in a capital trial for a juror who expresses a preconceived opinion of a defendant's guilt. Even more alarming is when the juror's remarks prejudging guilt also suggest racial

bias. In either circumstance, the trial court must be vigilant to ensure that other members of the panel have not been tainted irreparably by inappropriate comments made by the errant juror. Because the court made no effort to satisfy itself that the jury's impartiality had not been compromised by the suspect juror, we can have no confidence that the verdict was the product of a fair trial. Accordingly, we have no choice but to vacate defendant's conviction and death sentence and remand for a new trial.

## I.

### A.

The overwhelming evidence presented to the guilt-phase jury supported a finding that defendant killed Gary Marsh. On May 5, 1992, Marsh worked the midnight shift alone at the Exxon service station in Lawrenceville, New Jersey. At 6:30 a.m., a co-worker scheduled to relieve Marsh found him lying unconscious and bleeding on the office floor, the victim of a single gunshot wound to the head. Marsh died less than ten hours later.

At the scene, investigating police officers discovered several key clues that would assist in solving the crime. Although the Exxon station's records indicated that ninety dollars of revenue was generated during Marsh's shift, the police found the office's cash drawer empty. Notably, while Marsh was on duty, one customer had paid for gas with a fifty-dollar bill. The police could not locate Marsh's wallet and found only three dollar bills, loose change, and some personal effects in his pockets. The police, however, did find the bullet that killed Marsh in the office wall. Nothing about the crime scene suggested that Marsh had struggled with his assailant.

Four days after the murder, defendant attempted to purchase a computer from a Sears store in Pennsylvania using Marsh's credit card. While making the purchase, defendant spoke with a representative of the Sears central credit office and not only identified himself as Gary Marsh, but provided Marsh's social security card

number, age, address, and employer's name. Sears contacted the local police who arrived a short while later and arrested defendant for fraudulent use of a credit card and theft offenses. The police found in defendant's breast pocket a wallet, which contained Marsh's credit cards, social security card, health insurance card, driver's license, and various other documents. Also inside defendant's wallet were a fifty-dollar bill and a receipt for the purchase of a .380 caliber Bryco Model 48 pistol from D & S Gun Supplies of Levittown, Pennsylvania. A search of defendant's car parked outside the Sears store uncovered a .380 caliber Bryco Model 48 mounted underneath the driver's side dashboard along with two magazines for a .380 semi-automatic weapon in the glove compartment. The gun's serial number was identical to the number on the sales receipt in defendant's wallet. The police also discovered five-hundred rounds of .380 semi-automatic ammunition in defendant's home.

Significantly, ballistics tests revealed that the bullet taken from the Exxon office wall had been fired from the .380 caliber Bryco Model 48 pistol seized from defendant's car. The police, however, did not find defendant's fingerprints at the crime scene, or blood or gunshot residue on any of his confiscated clothes.

## B.

On September 11, 1992, a Mercer County grand jury returned a four-count indictment charging defendant with purposely or knowingly causing by his own conduct the death of Marsh, *N.J.S.A.* 2C:11–3a(1) or (2); felony murder, *N.J.S.A.* 2C:11–3a(3); first-degree armed robbery, *N.J.S.A.* 2C:15–1; and second-degree possession of a weapon with a purpose to use it unlawfully against another, *N.J.S.A.* 2C:39–4a. On October 20, 1992, the State served defendant with notice of its intent to prove three aggravating factors as part of its capital prosecution: murder committed in the course of a robbery, *N.J.S.A.* 2C:11–3c(4)(g); murder to escape apprehension for the robbery, *N.J.S.A.* 2C:11–3c(4)(f); and conviction for a prior murder, *N.J.S.A.* 2C:11–3c(4)(a), the killing

of sixty-nine year old Sophia Fetter. In time, defendant served the State with an intent to present evidence of four statutory mitigating factors and twenty-nine non-statutory factors pursuant to the catch-all provision of *N.J.S.A.* 2C:11–3c(5)(h).

At the conclusion of the eleven-day guilt-phase trial, a jury convicted defendant of all four counts in the indictment, concluding that he murdered Marsh by his own conduct. A different jury was impaneled to determine the appropriate penalty. First, the penalty-phase jury unanimously found that the State proved beyond a reasonable doubt the existence of each of the three aggravating factors. Second, one or more jurors found two statutory mitigating factors, "defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution," *N.J.S.A.* 2C:11–3c(5)(a), and defendant at the time of the murder was under the age of twenty-six, *N.J.S.A.* 2C:11–3c(5)(c), and seventeen non-statutory mitigating factors, *N.J.S.A.* 2C:11–3c(5)(h). Last, the jury unanimously concluded that the State had proven that the three aggravating factors outweighed the mitigating factors, individually and collectively, beyond a reasonable doubt.

That last finding required the trial court to impose the death sentence for capital murder. On the remaining counts, the court sentenced defendant to a concurrent twenty-year term with a ten-year parole-disqualifier for the robbery conviction and to a concurrent five-year term with a two-and-one-half-year parole-disqualifier for the weapons offense. The felony murder conviction was merged into the capital murder conviction. The court also ordered those sentences to run consecutive to the life sentence that defendant was serving for the murder of Ms. Fetter.

As mentioned earlier, this Court affirmed defendant's conviction and sentence on direct appeal, *Loftin I, supra,* 146 *N.J.* at 318, 680 *A.2d* 677, and upheld his sentence on proportionality review. *Loftin II, supra,* 157 *N.J.* at 266, 724 *A.2d* 129. In his PCR petition, defendant proffered twenty-eight grounds for reversal of

his capital and related convictions.[1] Defendant, among other things, argued that both his trial and appellate counsel performed so deficiently that they denied him the fundamental right to the effective assistance of counsel guaranteed by the Federal and State Constitutions. The PCR court rejected each claim raised by defendant.

We find that two of those claims alleging constitutionally ineffective assistance of trial and appellate counsel raise valid concerns. One claim is based on appellate counsel's failure to raise on direct appeal the trial court's refusal to remove a juror who expressed not only a predisposition toward defendant's guilt, but also potential racial bias. The other claim is based on trial counsel's dereliction in not requesting a voir dire of the jury to ensure that it was not tainted by the biased juror and appellate counsel's failure to raise that issue as plain error on appeal. A full factual exposition is necessary to address those issues.

## C.

On the fourth day of an eleven day guilt-phase trial, Tuesday, June 28, 1994, the trial judge received a telephone call raising questions concerning the impartiality of a juror. The caller, Mr. Smith,[2] an African–American, reported to the judge and counsel over a speaker-phone that he had overheard Juror No. 4, a fellow postal employee, making statements early that morning indicating that he had "[made] his mind up" about defendant's guilt. According to Mr. Smith, Juror No. 4, who is white, remarked that he was "going to the hardware store to buy rope to hang this man with."

---

[1] We consider each ground for relief raised by defendant whether directly raised in defendant's PCR petition or defendant's brief to this Court as a claim raised within the PCR petition.

[2] We have decided to use fictitious names rather than the actual names of Juror No. 4's co-workers.

Another of Juror No. 4's co-workers, Mr. Jones, also African-American, was summoned to the telephone to relate similar statements made by Juror No. 4 at the post office just days earlier. On the previous Friday, Mr. Jones asked Juror No. 4 about the case on which he was sitting as a juror. Juror No. 4 replied that the case involved the "[g]uy who shot the gas station attendant." His curiosity apparently piqued, Mr. Jones asked "[h]ow did it go," and Juror No. 4 began laughing. When Mr. Jones further pressed him, Juror No. 4 stated: "I'm going to the hardware store to get me a good rope so when we hang him, it won't break." The next day, Mr. Jones decided to confront Juror No. 4 regarding his earlier remarks. Juror No. 4 indicated that he could not discuss the case, that he would only say that he was "on the way to the hardware store." When asked why he was going to the hardware store, Juror No. 4 commented: "Because they got good ropes. I'm not going to K–Mart. K–Mart ropes break. I'm going to a hardware store where I can get a rope that won't break." In giving his reasons for bringing this information to the court's attention, Mr. Jones stated that he did not "know whether the man is guilty or not," but he nevertheless felt that it was "incumbent upon [him] as a citizen, you know, looking out for the rights of justice, you know, that the courts should be aware of this because I'm sure, you know, the courts would not condone, you know, this kind of remarks."

On the fifth day of the guilt-phase trial, in the presence of counsel, the trial judge brought Juror No. 4 into chambers and questioned him about the remarks attributed to him by his two co-workers. Juror No. 4 admitted making the hang-the-defendant-by-a-rope statement, but explained that he did so to stop his co-workers from "harassing" him. Because his co-workers already thought that he was "prejudiced," to end the harassment, he figured that he would tell them what they expected him to say. Juror No. 4 denied that he had formed an opinion regarding defendant's guilt or innocence. He did dispute that he had worked on Monday, thus contradicting Mr. Smith's account.

Defendant's counsel requested that Juror No. 4 be removed from the jury because he had prejudged defendant's guilt and because his comments revealed a racial bias. Counsel noted that four alternate jurors remained and added, "Why take a chance"? The prosecutor, on the other hand, believed that Juror No. 4 had been provoked by his co-workers and was "forthright an[d] honest" with the court. She accepted the juror's assertion that he harbored no predisposition regarding defendant's guilt or innocence.

Satisfied that Juror No. 4's answers revealed no predisposition, the trial judge decided to keep him on the jury. She observed that Juror No. 4 did not deny making the statements that offended his co-workers and that Mr. Jones had initiated the conversations that led to the offensive remarks. The judge concluded that "not every racially insensitive remark is necessarily a racist remark nor did it reflect predisposition." The judge instructed Juror No. 4 not to discuss with his fellow jurors or anyone else "the nature of [the] discussions with the [c]ourt."

At the conclusion of the trial, without objection from counsel, the trial judge determined that Juror No. 4 would be designated as an alternate juror, removing any possibility that Juror No. 4 would sit as a deliberating juror.[3] The trial judge decided that "the best interest of justice" required that Juror No. 4 not sit as a deliberating juror. She explained that she did not want to "excuse [Juror No. 4] at the beginning of the trial out of concern that [the court] would run out of jurors." Accordingly, Juror No. 4 did not participate in jury deliberations or in rendering a verdict. Up to that point, it appears that Juror No. 4 was treated no differently than any other juror and that his interaction with his fellow jurors was in no way curtailed. At no point did the trial judge voir dire the remaining jurors to inquire whether Juror No. 4 uttered in

---

[3] After consulting with both the State and defense counsel at the conclusion of summations, the trial judge indicated that if Juror No. 4 was not one of the first three individuals selected randomly as an alternate, then she would personally designate him as the fourth alternate.

their presence—before or after his court interview—remarks similar to the ones that offended his postal co-workers.

## D.

As noted earlier, defendant's counsel did not raise on direct appeal the trial judge's failure to remove Juror No. 4 immediately from the jury or to voir dire the jury to ensure that Juror No. 4 had not made prejudicial remarks poisoning the impartiality of the panel. In his PCR petition, defendant claimed that the issue was cognizable as a violation of his Federal and State rights to a fair and impartial jury, *see U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10, and to the effective assistance of counsel. The PCR court "perceive[d] no prejudice to the defendant" because Juror No. 4 did not participate in jury deliberations or render a verdict. On the other hand, the PCR court found that counsel should have requested and the trial judge should have conducted "[a]n individualized *voir dire* of the jury following the [Juror No. 4] disclosure." The PCR court, however, observed that "[t]he decision of trial counsel [to] forego individualized *voir dire* might not satisfy technocrats of trial tactics, but here, both counsel and the court, who were on the scene, saw no need for the same." Ultimately, the PCR court concluded that defendant's trial and appellate counsels' failure to pursue the voir dire issue "did not fall below an objective standard of reasonableness," and that the trial judge's "failure to question jurors individually had no impact on the jury or on its verdicts."

## II.

We must first determine whether the trial judge erred in not removing Juror No. 4 immediately from the jury. Then, we must decide whether the judge should have voir dired the other jurors to ensure that Juror No. 4 had not made comments exhibiting a predisposition toward guilt or racial bias that might have tainted the jury's impartiality. Those issues must be viewed through the lens of whether both trial and appellate counsel were constitutionally ineffective, trial counsel for not requesting a voir

dire of the jury and appellate counsel for not raising as error either the trial court's failure to disqualify Juror No. 4 or its failure to conduct a searching inquiry of the jury.

## A.

A defendant's right to be tried before an impartial jury is one of the most basic guarantees of a fair trial. *See U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10; *State v. Williams*, 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983) (*Williams I*) (explaining that "securing and preservation of an impartial jury goes to the very essence of a fair trial"). The trial court's duty is to give life to that constitutional principle by impaneling a jury that "is as nearly impartial 'as the lot of humanity will admit.'" *State v. Jackson*, 43 *N.J.* 148, 157–58, 203 *A.*2d 1 (1964) (citation omitted), *cert. denied*, 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965). Procedural fairness is a categorical imperative in all criminal cases; nevertheless, when a defendant is facing a potential death verdict, our jurisprudence imposes a heightened expectation of jury impartiality. *Williams I, supra*, 93 *N.J.* at 61–62, 459 *A.*2d 641. "A trial is poisoned at its inception if the jurors deciding the case cannot review the evidence dispassionately, through the light of reason." *State v. Fortin*, 178 *N.J.* 540, 575, 843 *A.*2d 974 (2004). For that reason, all doubts about a juror's integrity or ability to be fair should be resolved in favor of removing the juror from the panel. *State v. Singletary*, 80 *N.J.* 55, 65, 402 *A.*2d 203 (1979); *State v. Van Duyne*, 43 *N.J.* 369, 386, 204 *A.*2d 841 (1964), *cert. denied*, 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.*2d 279 (1965). Our jurisprudence requires that a juror who has formed an unalterable opinion of the defendant's guilt or innocence must be excused from service on the panel. *Williams I, supra*, 93 *N.J.* at 61, 459 *A.*2d 641.

## B.

We first address the nature of the juror's remarks, which suggest that he had predetermined defendant's guilt before hearing all of the evidence. Early in the State's presentation, Juror No. 4, a white juror, expressed to at least one of his African-

American co-workers a desire to hang by a strong rope defendant, who also was African–American. We do not know whether his comments were intended metaphorically or humorously. Certainly, Juror No. 4's African–American co-workers did not consider his remarks to be a laughing matter. Perhaps that is because the language of lynching when applied to a black defendant has a decided racial undertone that evokes an era of vigilante and mindless mob justice that reigned during a dark period in American history.[4] Here, defendant sat through the trial with what appeared to be a "hanging" juror deciding his fate.

At least one court has strongly disapproved of retaining on a panel a juror who engaged in a verbal exchange about lynching a defendant on trial. In *State v. Johnson*, an African–American defendant was tried for the alleged rape of a Caucasian girl. 630 *N.W.2d* 79, 81 n. 3, 83 (S.D.2001). During jury selection, one prospective juror made a side comment to another prospective juror, "I got a rope." *Id.* at 80. The other juror responded, "I have a tree." *Ibid.* That colloquy came to the attention of the trial court after the juror who made the "I got a rope" statement was sworn.[5] *Ibid.* When questioned in chambers, the juror

---

[4] In this country, in the post–1880 period, African–American males—because of their race—were the primary candidates for lynching. Lawrence M. Friedman, *Crime and Punishment in American History* 190 (1993). Between 1889 and 1930, four-fifths of all persons lynched in United States were African–Americans. *See* Arthur F. Raper, *The Tragedy of Lynching* 1–2 (1969); *see also NAACP, Thirty Years of Lynching in the United States: 1889–1918* (1919), *reprinted in The American Negro: His History and Literature* 7 (1969) (finding that between 1889 and 1918 of 3,244 persons killed by lynch mobs, 2,522 were African–Americans). The "reign of racial terror" did not end until "the triumph of the civil rights movement and the passage of comprehensive civil rights laws in the 1960s." *Friedman, supra,* at 191–92. According to one scholar, "[i]t is ... the knowledge that victims were chosen for their race and put to death in specific defiance of reasonable values of fairness or decency, that makes the story of lynching so burdensome an American legacy to confront." Phillip Dray, *At the Hands of Persons Unknown: The Lynching of Black America* xii (2002).

[5] The other juror was not selected as a member of the jury panel. *Id.* at 81 n. 2.

admitted making the comment and explained that he was just joking. *Id.* at 81. The juror denied harboring any racial bias and assured the court that he would decide the case with an open mind based solely on the evidence. *Ibid.* Accepting the juror's representations, the court rejected defendant's application for a mistrial. *Id.* at 81–82. The challenged juror was a member of the deliberating jury that convicted defendant of rape. *Id.* at 82.

The Supreme Court of South Dakota reversed defendant's conviction, holding that the juror's "derogatory racial remarks created a presumption of prejudice to [the defendant]," which had not been overcome by the prosecution. *Id.* at 84–85. South Dakota's high court reasoned that "the prejudicial remarks were of a severe nature that indirectly classified [the defendant] by his race and invoked the prejudice associated with the historical treatment of African–American males who have allegedly committed sexual improprieties with young Caucasian girls." *Id.* at 85. The court noted that it mattered not whether other deliberating jurors overheard the crude remarks; it mattered only that a single biased juror decided the defendant's fate, thus depriving him of the constitutional guarantee of an impartial jury. *Ibid.*

■ To be sure, any predetermination of guilt, whether or not motivated by racial bias, is inconsistent with a juror's duty of impartiality. *See, e.g., United States v. Unruh,* 855 *F.*2d 1363, 1376 (9th Cir.1987) (affirming district court's decision both to excuse juror who told co-worker that he thought "[defendants] were buried" and to question each remaining juror to ensure, among other things, that excused juror had not tainted them), *cert. denied,* 488 *U.S.* 974, 109 *S.Ct.* 513, 102 *L.Ed.*2d 548 (1988). Common sense dictates that jurors should be shielded from any external factor that might induce bias or prejudice, and therefore destroy the impartiality necessary for a fair trial. Unlike the biased deliberating juror in *Johnson,* here we must decide whether Juror No. 4's presence on the jury, even though he did not deliberate, had the capacity to influence the verdict in this death penalty case.

 That Juror No. 4 did not deliberate as a juror does not lessen the potential that he improperly influenced other members of the panel who rendered a verdict. Because the trial judge did not conduct a voir dire, we do not know whether Juror No. 4 shared with his fellow jurors any of the noxious sentiments he expressed to his co-workers. The test is not whether Juror No. 4's presence on the jury "actually influenced the result, but whether it had the capacity of doing so." *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951); *see also State v. Scherzer,* 301 *N.J.Super.* 363, 486, 694 *A.*2d 196 (App.Div.), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 878 (1997); *State v. Ribalta,* 277 *N.J.Super.* 277, 291, 649 *A.*2d 862 (App.Div.1994), *certif. denied,* 139 *N.J.* 442, 655 *A.*2d 444 (1995). Whenever the "intrusion of irregular influences" inside the jury room has the capacity to affect the outcome of a case, a new trial must be granted. *Panko, supra,* 7 *N.J.* at 61–62, 80 *A.*2d 302. That rigorous standard is intended to "keep[ ] the administration of justice pure and free from all suspicion of corrupting practices." *Ibid.* With those general principles in mind, we find guidance in a case with a strikingly similar factual scenario.

In *State v. Tyler,* before opening statements, a sworn juror advised the court that she could not remain unbiased as a result of her employment as a secretary in a law office with a criminal practice. 176 *N.J.* 171, 176–77, 821 *A.*2d 1139 (2003). The court believed that the juror's claim of bias was a disingenuous attempt to evade jury service after she had failed to convince the court that her employer could not function without her. *Id.* at 178, 821 *A.*2d 1139. Nonetheless, "[t]he judge agreed with defense counsel that [the juror] 'did express racial bias'" and that it would be inappropriate for the juror to deliberate with the panel. *Id.* at 182, 821 *A.*2d 1139. To punish the recalcitrant juror, the court ordered the juror to "sit with the jury for one day" after which she would be excused from service. *Id.* at 179, 821 *A.*2d 1139. The juror was instructed that she was "to have no conversation with any other member of [the] jury regarding [the] case or regarding [her] service." *Ibid.* The court overruled defense counsel's objec-

tion that the juror's presence "had the potential of 'infecting the entire panel'" if she conveyed her prejudice to the other jurors. *Id.* at 178, 821 *A.*2d 1139.

After the second day of trial, the court dismissed the juror, and that same day the jury convicted the defendant of several drug offenses. *Id.* at 173, 180, 821 *A.*2d 1139. In reversing the conviction, we concluded that a defendant did not have to show "actual prejudice." *Id.* at 182–83, 821 *A.*2d 1139. Writing for the Court, Justice Coleman stated that "[w]hen the integrity of the jury selection process has been compromised to the extent involved here, prejudice to a defendant will be presumed. When the judge left [the juror] in the jury box to punish her, defendant's constitutional right to a fair and impartial jury was compromised." *Id.* at 172, 183, 821 *A.*2d 1139. Thus, even allowing a non-deliberating juror suspected of racial bias to sit on a panel will lead to a presumption that other members of the panel may have been tainted. *See id.* at 183, 821 *A.*2d 1139.

Just as the juror's comments in *Tyler* strongly indicated her inability to be an impartial juror, Juror No. 4's comments clearly suggested that he had closed his mind and predetermined defendant's guilt. Juror No. 4 should have been removed from the jury panel as soon as the court confirmed that he made the statement: "I'm going to the hardware store to get me a good rope so when we hang [defendant], it won't break." That Juror No. 4 would make such a remark to an African–American co-worker in a case involving an African–American defendant suggests a level of racial insensitivity, if not outright racial bias, making him unfit to sit as a juror. Even more to the point, his remarks betrayed that he had condemned defendant—who was facing a potential death sentence—before he had heard all the evidence. Juror No. 4 violated two pledges he made to the court: to refrain from discussing the case with anyone other than fellow jurors during deliberations and to keep an open mind until the trial's conclusion.[6]

---

[6] Immediately after swearing in the jury, the trial judge gave the following instruction to the panel:

■ In light of this juror's admission to having uttered words to co-workers indicating that he had prejudged the case and harbored a racial bias, it was not enough for the trial court to accept the juror's after-the-fact explanation that he still could be fair. The juror claimed that his damning and racially insensitive statements were intended to stop his African–American co-workers from asking further questions about the case. We do not find that that explanation dissipated the serious doubts raised about the juror's impartiality. The juror's conduct alone undermined any trust that he could perform his duties in accordance with his oath. Although ordinarily the decision whether to excuse a juror lies in the sound discretion of the trial judge, an appellate court is not bound by a determination when the "particular circumstances present such a strong likelihood of prejudice that, as a matter of law," the juror should have been removed. *State v. Biegenwald,* 106 *N.J.* 13, 91, 524 *A.*2d 130 (1987).

In a capital case in which heightened standards of procedural fairness are applied, Juror No. 4's shocking comments at the post office required prompt action to ensure that he did not infect the impartiality of the entire panel. Instead, Juror No. 4 was permitted to continue to sit on the panel for approximately another six days until the conclusion of summations, at which point the trial judge realized that he presented too great a risk as a deliberating juror and selected him to be an alternate. If, as the trial judge concluded, the interest of justice would have been disserved by Juror No. 4 sitting as a deliberating juror, then that same interest in doing justice should have impelled the immediate removal of

---

During the course of the trial, we will have recesses, such as at lunch time, and we'll have weekend recesses. You are directed not to discuss this case with anyone. That includes jurors from other panels, family members, friends. You're not to begin any discussions about this case until all of the evidence has been presented, until the attorneys have given their closing arguments, until you've heard the final instructions from the Court.

... If there should at any time be anyone who would attempt to approach you and discuss any aspect of this case, you are to report that fact to one of the Sheriff's Officers who have been assigned to this particular trial.

Juror No. 4 to insulate the remaining jurors from any taint or prejudice. Surely, if the juror expressing bias in a drug case should have been removed from the panel in *Tyler*, no less a remedy should satisfy the constitutional demand for jury impartiality in this capital case.

In summary, in light of Juror No. 4's hang-the-defendant comments, we can have no confidence in the trial judge's credibility finding that Juror No. 4 could have remained fair and impartial. In the end, the trial judge did not have confidence in her own decision because she removed any possibility that Juror No. 4 would sit as a deliberating juror.

## C.

That Juror No. 4 should have been disqualified from further service does not end our analysis. We now must determine whether Juror No. 4's presence on the panel, even as a non-deliberating juror, compromised the impartiality of the entire panel. As in *Tyler*, we must presume prejudice because of Juror No. 4's constant exposure to the jury both before and after his improper comments were revealed to the trial court. The presumption of prejudice standard requires that we accept, as a starting point, that Juror No. 4 displayed to his fellow jurors his predisposition toward guilt. That is, we do not speculate that the biased viewpoint expressed to his co-workers was not conveyed to his fellow jurors.

How then is the presumption of prejudice overcome? If we accept as a *presumed* fact that the other jurors were exposed to Juror No. 4's preconceived views of guilt, that presumption could be overcome only in one of two ways: the trial court had to voir dire the jury and satisfy itself either that Juror No. 4 did not express predetermined or biased views to other jurors or that if he did, the jurors were not influenced by those views. Therefore, the trial court first should have dismissed Juror No. 4 and then voir dired the jury. In cases in which a jury has been potentially exposed to external influences that could undermine jury impar-

tiality, our courts have not hesitated to make inquiry of the jurors to ensure that they have not been fatally tainted.

*State v. Bey* involved highly prejudicial trial publicity in a capital case that threatened to undermine the defendant's right to a "fair and impartial jury." 112 *N.J.* 45, 74–75, 79–80, 548 *A.*2d 846 (1988). During the defendant's trial, newspapers published articles that reported on defendant's indictment in another murder and his prior robbery and assault convictions. *Id.* at 79–80, 548 *A.*2d 846. One newspaper printed "a strongly worded commentary criticizing recent sentences in murder cases as overly lenient." *Ibid.* The trial court denied the defendant's request for a mistrial as well as his request that jurors be polled to determine whether any had read the offending articles. *Id.* at 80, 548 *A.*2d 846. Without making any inquiry, the court was satisfied that the jurors followed the cautionary instructions given to them not to read such newspaper articles. *Ibid.*

We reversed the defendant's capital murder conviction for, among other reasons, the trial court's failure to ascertain through voir dire that the negative media coverage had not compromised the jury's impartiality. *Id.* at 51, 81, 548 *A.*2d 846. We held that

> [w]here the court concludes there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of [the] jury, it should conduct a *voir dire* to determine whether any exposure has occurred. If there is any indication of such exposure or knowledge of extra-judicial information, the court should question those jurors individually in order to determine precisely what was learned, and establish whether they are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court.
>
> [*Id.* at 86–87, 548 *A.*2d 846.]

One case that followed the *Bey* approach is *State v. Phillips,* which involved a juror suspected of racial bias. 322 *N.J.Super.* 429, 434–35, 731 *A.*2d 101 (App.Div.1999). In *Phillips,* the Appellate Division reversed a murder conviction because of the inadequate questioning of the panel after one juror claimed that another juror made a disparaging racial remark. *Id.* at 441–42, 731 *A.*2d 101. The preferred approach, the court added, would have been to question the jurors singly to determine the impact of the

objectionable remark. *Id.* at 441, 731 *A.*2d 101. The court observed that "an allegation that a juror is racially biased strikes at the very heart of the defendant's right to a trial by an impartial jury," and "public confidence in the fair administration of justice is undermined if such allegations are not thoroughly investigated." *Id.* at 442, 731 *A.*2d 101. The construct we outlined in *Bey* has been followed in other non-capital cases as well. *See State v. Wormley,* 305 *N.J.Super.* 57, 68–70, 701 *A.*2d 944 (App.Div.1997) (finding that despite excused juror's denial of having disclosed to other juror that she knew State's witness, there was "strong likelihood that, even indirectly or unintentionally, she may well have," and therefore failure of trial court to voir dire jury required reversal of defendant's conviction), *certif. denied,* 154 *N.J.* 607, 713 *A.*2d 498 (1998); *Scherzer, supra,* 301 *N.J.Super.* at 487, 694 *A.*2d 196 (recognizing that when juror irregularity is brought to trial court's attention, court must examine whether information is capable of prejudicing defendant, and if so "[trial] judge must conduct voir dire, preferably individually in camera, to determine whether any jurors were exposed to the information").

Because *Tyler* held that the presence of a juror who harbors bias carries the potential to taint the jury, designating the juror in this capital case as an alternate after eleven days of trial did not adequately protect defendant's fair-trial rights. During that eleven-day period, a biased juror freely associated with other members of the entire panel. The presumption of prejudice that attached to Juror No. 4's participation in the proceedings, even as a non-deliberating juror, required the type of voir dire outlined in *Bey, Phillips, Wormley,* and *Scherzer.* In light of the trial court's failure to inquire of the jury whether Juror No. 4 expressed his bias or predisposition and, if so, whether any juror was influenced by him, the presumption of prejudice could not be overcome.[7]

---

[7] We do not suggest that the voir dire necessarily would have required specific questioning about Juror No. 4. General questioning intended to elicit whether communication of a predisposition or bias by a juror probably would have

Therefore, defendant did not receive his constitutionally guaranteed right to trial by an impartial jury.

Denying an accused the right to an impartial jury is to deprive him of the " 'very essence of a fair trial' " and therefore is not susceptible to a harmless error analysis. *See State v. Gilmore*, 103 *N.J.* 508, 543–44, 511 *A.2d* 1150 (1986) (noting that infraction of "right to trial by an impartial jury ... may not be treated as harmless error") (quoting *Williams I, supra*, 93 *N.J.* at 60, 459 *A.2d* 641); *see also Hughes v. United States*, 258 *F.*3d 453, 463 (6th Cir.2001) (impaneling of biased juror is a structural defect defying harmless error analysis); *Johnson v. Armontrout*, 961 *F.*2d 748, 756 (8th Cir.1992) ("The presence of a biased jury is no less a fundamental structural defect than the presence of a biased judge. We find this claim outside the gamut of harmless error analysis."). No matter how overpowering the State's case may be, a defendant has the right to have his fate decided by twelve impartial jurors. If denied that right, an appellate court cannot substitute its own judgment by finding the evidence sufficient to support a hypothetical verdict rendered by an unbiased jury. We are mindful of the resources expended in trying this case. But we have always been willing to pay a high price for maintaining the sanctity of our jury system. *State v. Williams*, 113 *N.J.* 393, 409, 550 *A.2d* 1172 (1988) (*Williams II*) ("Even in a case ... where the evidence of guilt is compelling, the right to a fair trial must be diligently protected to insure that all defendants, regardless of the crime charged or the weight of the evidence produced, are tried by a fair and impartial jury."); *State v. Wagner*, 180 *N.J.Super.* 564, 567, 435 *A.2d* 1190 (App.Div.1981) (finding that at times, "courts should not hesitate to reverse," even in the absence of prejudice if jury selection is not "wholly free from taint and suspicion"); *cf. State v. Roberts*, 47 *N.J.* 286, 290–91, 220 *A.2d* 416 (1966) (reversing defendant's manslaughter conviction because, even though

---

sufficed. Because the object of the questioning would have been to elicit—not inject taint—the voir dire would have required a delicate approach.

judge was probably misquoted uttering racially derogatory epithet and despite strong evidence of guilt, "image of justice would be better served by a new trial").

## D.

The issue of Juror No. 4's bias and its effect on the panel's impartiality was not raised on direct appeal and comes before us on defendant's PCR claim that he was denied his Federal and State constitutional right to the effective assistance of both trial and appellate counsel. "Post-conviction relief is a defendant's last opportunity to raise a constitutional challenge to the fairness and reliability of a criminal verdict in our state system." *State v. Feaster,* 184 *N.J.* 235, 249, 877 *A.*2d 229 (2005). All the players in our system of justice—the defendant, the prosecutor, and the citizens of the State—have a particularly strong "interest in insuring that there is no mistake in the imposition of the death penalty." *State v. Koedatich,* 112 *N.J.* 225, 332, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). Although defendant seeks relief on both Federal and State grounds, we have decided to treat the issue solely under Article I, Paragraph 10 of the New Jersey State Constitution, which guarantees to every person accused of a crime the "assistance of reasonably competent counsel." [8] *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987); *see also State v. Allah,* 170 *N.J.* 269, 282–84, 787 *A.*2d 887 (2002).

In determining whether any deficiencies in trial or appellate counsel's representation have undermined a defendant's constitutional right to counsel, we have generally relied on the standards enunciated in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984). *State v. Harris,* 181 *N.J.* 391, 518, 859 *A.*2d 364 (2004) (noting that *Strickland/Fritz* standard also applies to appellate counsel), *cert. denied,* 545 *U.S.* 1145, 125 *S.Ct.*

---

[8] Article I, Paragraph 10 provides that "[i]n all criminal prosecutions the accused shall have the right ... to have the assistance of counsel in his defense."

2973, 162 *L.Ed.*2d 898 (2005); *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336. In *Strickland,* the United States Supreme Court established a two-prong test for assessing such claims. A defendant must show: (1) that counsel's performance "fell below an objective standard of reasonableness," *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698; *see also State v. Castagna,* 187 *N.J.* 293, 313–14, 901 *A.*2d 363 (2006).

A defendant satisfies the first prong if he demonstrates that counsel's performance "fell 'outside the wide range of professionally competent assistance.'" *Castagna, supra,* 187 *N.J.* at 314, 901 *A.*2d 363 (quoting *Strickland, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). To do so, the defendant must overcome a "strong presumption" that counsel exercised "reasonable professional" judgment and "sound trial strategy" in fulfilling his responsibilities. *Ibid.* (citation omitted). We recognize that " '[j]udicial scrutiny . . . must be highly deferential,' and must avoid viewing the performance under the 'distorting effects of hindsight.'" *State v. Norman,* 151 *N.J.* 5, 37, 697 *A.*2d 511 (1997) (quoting *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694). Nonetheless, even under that highly deferential standard, we cannot find in this case that trial and appellate counsels' approach to issues arising from Juror No. 4's biased comments met the minimal standards expected of an attorney in a capital case.

Here, the need for the immediate removal of the predisposed juror and a voir dire of the remaining jurors should have been self-evident. As such, trial counsel's failure to request that the jury be voir dired cannot be excused as a reasonable or sound trial strategy in a garden-variety criminal trial much less a capital case. In particular, by not raising both of these elementary issues concerning the need to excuse Juror No. 4 and voir dire of the jury, appellate counsel deprived this Court of the opportunity of

addressing whether defendant was denied his fundamental right to a fair trial by an impartial jury.

Defendant in this case satisfied the *Strickland* second prong because not only was there "a reasonable probability," but a near certainty that had appellate counsel raised on direct appeal Juror No. 4's bias and its potential effect on the entire jury panel, the result "would have been different" before this Court at that time. *See Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. Appellate counsel's dereliction kept from the Court an egregious error that could have been corrected on direct appeal. We can have no confidence in a jury verdict that is the product of a biased jury. Because the trial court did not voir dire the jury to eliminate the potential that it had been tainted by a biased juror, the State cannot overcome the presumed bias that, pursuant to *Tyler*, attaches to the entire jury panel. Consequently, we hold that the deficient performances of both trial and appellate counsel denied defendant the assistance of reasonably competent counsel guaranteed to him under Article I, Paragraph 10 of our State Constitution.

We also conclude that a remand to conduct a jury voir dire is not a feasible remedy. In December 1999, defendant's counsel filed a motion with the PCR court to permit the interviewing of the guilt-phase jury pursuant to *Rule* 1:16. That rule provides: "Except by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney interview, examine, or question any grand or petit juror with respect to any matter relating to the case." *R.* 1:16. The interview would have involved questions concerning Juror No. 4 as well as subjects not relevant to this appeal. In June 2001, the PCR court denied the interview request, in part on the basis that "[n]o evidence [was] presented that [Juror No. 4's] comments to his co-workers reached the ears of his fellow jurors."

Now, almost thirteen years have passed since defendant's guilt-phase trial. To reconvene the guilt-phase jury at this time,

however appealing it may seem, is not practicable. Even assuming that all the jurors are still alive and have not suffered an illness or condition that has affected their cognitive abilities, after the passage of so many years, we would have little faith that juror interviews could produce reliable recollections sufficient to satisfy us to uphold a death sentence. The recollection of the most dutiful and honorable juror, however seemingly certain, will be fraught with the potential for error because of the possibility that in the intervening years even important words exchanged between jurors have been forgotten. We can demand only so much of human memory, with all its known frailties, in attempting to reconstruct long ago proceedings, and therefore caution must be our guide when the stakes are so high. We must have a high degree of confidence in the results of a proceeding affirming a death sentence. That level of confidence will never be reached from juror interviews at this late date. However reluctantly we make this concession, we do so in the interest of justice. *See Phillips, supra,* 322 *N.J.Super.* at 442, 731 *A.*2d 101 (reversing conviction and finding that remand to reconvene jury to determine whether racial bias had been injected into its deliberations was impractical because with passage of time "memories have undoubtedly faded and, significantly, neither the State nor the defendant has urged us to adopt this approach"). We therefore are compelled to grant defendant a new trial.

### III.

For guidance to the trial court and counsel, we also address whether the pre-sentence investigation (PSI) report prepared following defendant's non-capital murder conviction in Atlantic County can be used at his capital retrial in Mercer County. In his PCR petition, defendant claims that his capital counsel defaulted when they did not provide him with representation at his Atlantic County PSI interview while he was awaiting trial on his death penalty case in Mercer County. Before the trial court, defendant

argued that statements he made to the probation officer should have been suppressed.

We conclude that capital counsel failed to provide reasonably competent representation to defendant when they allowed him to be interviewed alone by the Atlantic County Probation Department. However, we do not believe that the appropriate remedy is exclusion of defendant's statements at retrial merely because those statements may be inconsistent with the penalty defense he presents. If defendant offers a mitigation defense that arguably is in conflict with his interview remarks, the State, which is blameless, should not be restrained from impeaching that defense in furtherance of the truth-seeking purpose of the hearing.

## A.

We provide the following background to frame the issue. Following defendant's conviction for murdering Sophia Fetter, Daria A. Christie of the Atlantic County Probation Department prepared the pre-sentence investigation report.[9] At that time, defendant was set to stand trial in Mercer County for the capital murder of

---

[9] Before sentencing, the probation department must conduct a presentence investigation as required by *N.J.S.A.* 2C:44-6, and must report the findings to the court. *R.* 3:21-2(a). The presentence investigation must include various assessments, including, in part:

an analysis of the circumstances attending the commission of the offense, the defendant's history of delinquency or criminality, family situation, financial resources, including ... employment history, personal habits, the disposition of any charge made against any codefendants, the defendant's history of civil commitment, any disposition which arose out of charges suspended pursuant to *N.J.S.* 2C:4-6 including the records of the disposition of those charges and any acquittal by reason of insanity pursuant to *N.J.S.* 2C:4-1, and any other matters that the probation officer deems relevant or the court directs to be included. The defendant shall disclose any information concerning any history of civil commitment. The report shall also include a medical history of the defendant and a complete psychological evaluation of the defendant in any case in which the defendant is being sentenced for a first or second degree crime involving violence....

[*N.J.S.A.* 2C:44-6b.]

Gary Marsh. In that case, defendant had been assigned two attorneys to represent him.

On or about October 7, 1993, Christie interviewed defendant, who was neither accompanied by the attorney in his Atlantic County case nor by the capital defense attorneys in his Mercer County case. During the one-on-one interview, defendant "denied any history of mental health problems or treatment." Christie concluded that "there was no overt evidence of [mental health] problems detected during the PSI interview." [10] In preparing the PSI, the probation officer also contacted, among others, defendant's wife, his mother-in-law, and a prior employer. Christie learned that "defendant was at times physically and emotionally abusive to his wife and children," and blamed those he abused "for his violent behavior towards them and did not express or otherwise exhibit remorse for his actions."

Before defendant's PSI interview, his capital counsel had no communication with his Atlantic County attorney. Additionally, those attorneys never informed defendant that his Atlantic County PSI interview could be used in his capital case. In the penalty phase of the capital trial, to impeach and rebut his mitigation defense, the prosecutor turned to the results of the PSI interview.

Defendant presented a number of mitigating factors in the penalty phase of his capital trial, including the statutory factor whether "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect, but not to a degree sufficient to constitute a defense to prosecution, *N.J.S.A.* 2C:11–3c(5)(d)." In the "catch-all" mitigating factor category, *N.J.S.A.* 2C:11–3c(5)(h), defendant claimed that he "shared a positive relationship with his wife and children"; "was suffering from impaired mental capacity at the time the

---

[10] Christie also noted that there was a psychiatric evaluation of defendant completed in early 1993, but that defendant's Atlantic County attorney refused to reveal the evaluation's results.

crime was committed"; and "had the love and support of his family."

In support of the mental impairment defense, defendant called Dr. Edward J. Dougherty, a psychologist, who concluded that at the time of the killing defendant suffered from borderline personality disorder. Although Dr. Dougherty was confronted with defendant's disclosure in the PSI report, he had already explained under direct examination that "with many mental illnesses, people don't necessarily know they have it." However, defendant's denial of a mental health problem in the PSI reinforced the State's expert psychiatrist, Dr. Charles Martinson, who concluded that defendant did not suffer from "any mental disease, mental illness, mental defect, or mental disorder as defined in the [Diagnostic and Statistical Manual–IV]."

In addition, defendant presented Carmeta Albarus, who testified to defendant's psychosocial history through a review of various institutional records and interviews of his family members. Albarus and defendant's wife, who also testified, portrayed defendant as a kind and loving family man. That verbal picture was shredded by probation officer Christie, who testified consistent with her PSI report that defendant abused both his wife and children and that his wife did not call the police because she feared him.

The PCR court found that defendant's capital counsel should have consulted with him or his Atlantic County counsel to make certain that defendant refrained from making any statement in the PSI interview that could adversely affect the Mercer County case. The PCR court noted that counsel "bore the obligation of closely monitoring the Atlantic County case, especially after the defendant's conviction, knowing that the Atlantic County verdict and sentence would serve as a springboard for the probable imposition of the death penalty in Mercer County." In the end, however, despite counsel's deficiencies, the PCR court determined that defendant suffered no constitutional harm because he made "virtu-

ally the same concessions to" the State's psychiatric expert that he made to the probation officer.

Concerning capital counsel's failure to advise defendant's family members that they might be interviewed by a probation officer in his Atlantic County case, the PCR court held that counsel did not deny defendant constitutionally effective assistance of counsel. The court found that, in its experience, counsel could not have been expected to know that Christie would interview defendant's family members and therefore to warn them "about the consequences of making statements to the probation officer." Thus, in the PCR court's opinion "[o]nly in hindsight does counsel's failure to consult with family members appear to be negligent."

### B.

We first address capital counsel's failure to speak with defendant's family in advance of the probation officer's interview of them. Whether or not capital counsel had an obligation to speak with the family members before the pre-sentence interview, it would be speculative to conclude that the family members would have acted differently in response to Christie's questions to them. Nothing in the record suggests that the information received by Christie was not truthful and reliable. Christie performed her duties by obtaining the widest array of information to depict the "whole person" for sentencing purposes, *State v. Brooks,* 175 *N.J.* 215, 235–36, 814 *A.*2d 1051 (2002), and the information received was not the product of any misconduct by the State.

Defendant cannot present testimony depicting himself in a false light and expect that verbal portrait to go unrebutted by contrary information possessed by the State. In this case, the contents of the Atlantic County PSI report placed in question the credibility of defendant's mitigation defense. We see no sound reason for suppressing lawfully gathered evidence that is relevant to a disputed issue. Ultimately, the jury will decide where the truth lies.

■ Next, we agree with the PCR court that defendant's capital counsel were derelict in allowing their client, unaccompanied by a lawyer, to be interviewed by an Atlantic County probation officer while defendant was facing a death penalty trial in Mercer County. They did not communicate or coordinate with defendant's Atlantic County counsel, who instructed defendant to cooperate with the PSI interview without considering any of the negative consequences for the upcoming capital case. It is surprising that Atlantic County counsel, at such a critical time, would have set his client adrift to fend for himself. The performance of these attorneys fell woefully beneath the standards expected of members of the bar who represent clients accused of murder or capital murder.

In this State, we have heightened procedural standards protecting capital defendants, *State v. Timmendequas,* 161 *N.J.* 515, 721, 737 *A.*2d 55 (1999), *cert. denied,* 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001), and therefore we must have heightened expectations of the lawyers who represent those facing the death penalty. *State v. Oglesby,* 122 *N.J.* 522, 544, 585 *A.*2d 916 (1991) (Handler, J., concurring) ("[S]pecial considerations present in capital cases demand specialized competence on the part of counsel. Counsel in these cases must provide competence grounded in experience, training, and professional skill that will suffice to provide a defendant with the full measure of all the heightened protections a capital-murder prosecution engenders."). Defendant's capital counsel, unquestionably, should have consulted with their client before the PSI interview in Atlantic County and either accompanied him or arranged for his Atlantic County counsel to accompany him to that interview. That was a professional obligation, a minimal standard that should have been followed by capital counsel.

The American Bar Association's guidelines for capital defense counsel is consistent with that approach:

If an official presentence report or similar document may or will be presented to the court at any time, counsel should become familiar with the procedures

governing preparation, submission, and verification of the report. In addition, counsel should:

. . . .

2. provide to the report preparer information favorable to the client. In this regard, counsel should consider whether the client should speak with the person preparing the report; if the determination is made to do so, *counsel should discuss the interview in advance with the client and attend it* [.]

[*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* Guideline 10.12(A)(2) (Feb.2003) (emphasis added).]

The approach that we take is equally applicable to a pre-sentence interview for a predicate murder conviction that precedes an impending capital trial.

　　　　　We emphasize that neither the probation officer nor the State has committed any wrong, and therefore exclusion of defendant's interview remarks that he did not suffer from a mental illness is not an appropriate remedy, particularly given that the State will argue that those remarks are inconsistent with the mitigation defense he will present. *Cf. State v. Evers,* 175 *N.J.* 355, 376, 815 *A.2d* 432 (2003) (noting that main purpose of exclusionary rule "is to deter future unlawful police conduct" (internal quotation marks and citations omitted)). In this procedural setting where there is no governmental wrongdoing, we will not suppress truthful information offered to rebut the veracity of a mitigation defense.

We do note that defendant repeated to the State's psychiatric expert comments about his mental health similar to those he made to the probation officer. Notably, in the previous penalty trial, defendant's psychiatric expert gave a simple and plausible explanation for defendant's inability to self-diagnose a mental defect from which he may be suffering. Of course, the jury is the final arbiter of such questions. Accordingly, the use of the PSI report for the purposes we have discussed will not deny defendant a fair penalty trial, if the case proceeds to that point.

## IV.

Trial by an impartial jury is among the most fundamental rights protected by our State Constitution. For the reasons given, we

hold that the trial court erred by not excusing a juror who appeared to be biased and who, by his own words, predetermined defendant's guilt. In light of what was known about that juror, who remained on the panel until jury deliberations, the trial court was obliged to voir dire the remaining jurors to make certain that none had been tainted. The failure of the court to ensure that the jury's impartiality had not been compromised requires that we reverse defendant's guilt and penalty phase verdicts.

We remand for a new trial consistent with this opinion.

JUSTICE RIVERA-SOTO, dissenting.

Nearly thirteen years after defendant Donald Loftin was convicted by a jury of the murder of Gary K. Marsh and was sentenced to death, the majority now holds that the trial judge erred when it did not remove a non-deliberating juror from the jury mid-trial, and that such error was the result of constitutionally ineffective assistance of counsel by defendant's trial and appellate counsel. In the majority's view, that conclusion warrants the reversal of defendant's conviction and sentence, which were affirmed by this Court,[1] and a remand for a new trial.

Because I cannot agree with either the conclusions reached by the majority or with the remedy it orders, I respectfully dissent.

## I.

The majority agrees that the evidence that defendant murdered his victim was "overwhelming[.]" *Ante* at 180, 922 *A.2d* at 1214. The issue before us, however, is divorced from defendant's guilt.

---

[1] As the majority notes, "[t]his Court affirmed defendant's conviction and sentence on direct appeal, *State v. Loftin*, 146 *N.J.* 295, 318, 680 *A.2d* 677 (1996) (*Loftin I*), and upheld his sentence on proportionality review, *State v. Loftin*, 157 *N.J.* 253, 266, 724 *A.2d* 129 (*Loftin II*), *cert. denied*, 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.2d* 193 (1999)." *Ante*, 191 *N.J.* at 179, 922 *A.2d* at 1214. Ironically, defendant's direct appeal, in parts, focused on jury selection issues, *Loftin I, supra,* 146 *N.J.* at 337–42, 680 *A.2d* 677, and defendant's post-penalty phase request to interview the penalty-phase jurors, *id.* at 380–82, 680 *A.2d* 677.

Instead, it addresses directly the structural nature of criminal proceedings and how to insure their fairness. That is why the conduct of the proceedings is examined closely, with a view towards their ultimate fairness. That examination requires that we hew closely to the record below.

The majority summarizes fairly the events that led to the individual voir dire of a juror on the fourth day of trial: the trial court received a telephone call from one of the juror's co-workers who claimed that the juror stated that "I'm going to the hardware store to get me a good rope so when we hang him, it won't break." *Ante* at 184, 922 *A.*2d at 1217. After speaking with the caller and another of the juror's co-workers,[2] the trial judge individually questioned the juror,[3] an inquiry that merits setting forth at length:

> THE COURT: Have a seat, [Juror No. 4].
>
> I have asked you to come in because I was contacted and it was reported to the Court that you were heard making remarks, not about the facts of this case, but about the fact that you were on your way to the hardware store to get a rope and you were going to make sure that it was a rope that did not break and these comments were made at [the juror's employment] Friday and possibly Monday, early Monday morning of this week and I thought I will give you an opportunity to come in and, perhaps, you can shed some light on what, if anything, happened.
>
> THE JUROR: Nothing did happen. It was just that everybody was harassing me at my job because they found out what I was doing from the letter you gave us to give to our employer. That's all it was, simple harassment from my fellow [employees].
>
> THE COURT: And did you respond? And what we were told specifically is that you did not discuss the case, but you made some—
>
> THE JUROR: Right.
>
> THE COURT:—What was viewed as smart remarks where you were on the way to the hardware store.
>
> THE JUROR: Yes, just so that they would stop harassing me.
>
> THE COURT: Okay. All right. *In making that statement, have you formed an opinion with respect to the guilt or innocence of this defendant?*

---

[2] Those conversations occurred over a single, uninterrupted telephone call, with all counsel present, and were recorded and transcribed.

[3] That questioning occurred in camera the following day, with all counsel present, and it too was recorded and transcribed.

THE JUROR: *Oh, no. No.*

THE COURT: Is there any particular reason you chose that language in addressing the harassment from your fellow employees?

THE JUROR: Well, you would have to know the people that were harassing me to understand it.

THE COURT: Well, I would. I'm trying to understand it. If you could shed a little bit of light on it for the record.

THE JUROR: The people that were harassing me would not let anything go, they will just keep harassing and harassing and harassing. So to stop the harassment and to tell them what they think I would say, that's merely a statement that I made because they think they know me but they don't.

THE COURT: Well, what are you saying they think they know you? What is it they think they know about you[?]

THE JUROR: Well, they think that I'm prejudiced.

THE COURT: Okay. So the people around whom—the people who are harassing you, you're telling me are minorities?

THE JUROR: Yes, some of them, yes.

THE COURT: Some of them?

THE JUROR: Some are white.

THE COURT: And they think that you're prejudiced?

THE JUROR: Oh, yeah.

THE COURT: And so what you're saying is that you said that in an effort to—

THE JUROR: Stop them from keep coming at me.

[ (emphasis supplied).]

It was after that colloquy that one of defendant's counsel first asserted that he thought the juror's "comments are racist." [4]

The trial judge's comments immediately following the juror's individual voir dire were telling, and merit review in full. After requesting that the juror excuse himself for a few moments and in the presence of counsel alone, she explained that her

---

[4] Significantly, other than defense counsel's thoughts, there is nothing in this record on which to base a claim that the juror wished to "lynch" defendant. As a result, the majority's leap from this juror's exasperated comments to the emotionally charged specter of a lynching is without foundation and, ultimately, unnecessary. *Ante* at 187–88, 922 A.2d at 1219–20. Hanging, as a long-standing method of execution, is color-blind. *See* Michigan State University, "The Death Penalty," *available at http://deathpenaltyinfo.msu.edu/c/about/methods/hanging.htm.* In the context of a death penalty case, it is an unwarranted and unfair stretch to equate the juror's comments with anything other than the hanging of an "overwhelming[ly] proven]" murderer.

comments off the record earlier about excusing him one way or the other were precipitous. I'm going to explain to you why the Court findings the Court made initially were precipitous. Number one, I have a specific recollection of the colloquy between the Court and most specifically Mr. [Jones] [5] who is the gentleman that had the conversation with [the juror] on Friday and Saturday. In fact, both Mr. [Jones] indicated that it was he and the other people who were approaching [the juror] to ask about the case and that [the juror] did not initially say anything to him. [The juror] just smiled and then this particular individual quoted another person and ... he did say [that] this person repeated[ ] to him the comment about getting the rope and it was then that Mr. [Jones] stated that he then went to [the juror] and questioned [the juror] about it.

He also indicated that at the end of [the juror]'s tour, he again approached [the juror] and asked him had he gotten the rope, had he been to the hardware store and what I ask[ed] him [was] what did he mean by that, he was saying he went out earlier in the morning and then at the end of the day he comes back in so they checked on the Saturday morning, Mr. [Jones] again indicates that he, in fact, went to [the juror] and approached him again about it.

Now, Mr. [Jones] indicates that he took offense to it and I don't recall in any event, colloquy with the Court they at any time said anything to [the juror] about taking offense to what he was saying, but it's clear to the Court that every conversation with [the juror] was initiated by Mr. [Jones], using that as a framework to reach the decision that I have reached, people within the work place often say things that are insensitive, whether they're remarks made by one racial group in the context of another, not every racially insensitive remark is necessarily a racist remark nor did it reflect predisposition.

[The juror] does not deny he made the statement. He said he made the statement because he knew that's what he wanted—that's what they wanted to hear, that is he prejudice[d] and is being prejudice[d] by co-workers and co-workers basically go to him and he reacted in kind.

As a result, the trial judge concluded that she was "going to keep [the juror] on this jury, notwithstanding [defendant's] objections." She explained that there were not "enough facts from which this Court could conclude that this individual is predisposed[.]" The trial judge noted that she "ha[d] made inquiry of [the juror] and [the juror] has indicated that he is not predisposed[.]" Asking the juror to return and addressing the juror directly, the trial judge concluded as follows:

[5] I have followed the naming convention established by the majority in respect of the juror's two co-workers who were examined over the telephone. *Ante* at 208 n. 2, 922 A.2d at 1216 n. 2.

I appreciate your honesty in coming forward. The Court has made a decision to permit you to continue at this juncture as a juror in this matter. You have indicated quite candidly, in the opinion of the Court, that the circumstances under which this statement was made, you have indicated to the Court that you're not predisposed and the Court is therefore satisfied with your answers at this point and ask[s] you [to] continue to serve as a juror.

As that record clearly discloses, the trial judge conducted an exhaustive inquiry of the non-deliberating juror in question, concluding that he was candid and was not predisposed towards guilt. For that reason alone, the majority's holding that the trial judge erred when she failed to "interview the remaining members of the panel to confirm that the juror did not communicate to them any preconceived notions of defendant's guilt[,]" *ante* at 179, 922 *A.*2d at 1214, is unsustainable. Despite that factual error, the majority nonetheless concludes that, "[b]ecause the [trial] court made no effort to satisfy itself that the jury's impartiality had not been compromised by the suspect juror, we can have no confidence that the verdict was the product of a fair trial.... [Therefore,] we have no choice but to vacate defendant's conviction and death sentence and remand for a new trial." *Ante* at 180, 922 *A.*2d at 1214.

That conclusion is the product of unsupported speculation founded on a false premise: that the non-deliberating juror questioned had "preconceived notions of defendant's guilt" that *could* have been communicated to his fellow jurors and, hence, required exploration. The record shows, in contrast, that the trial judge specifically found the contrary.

In that context, we have long held that "the trial court is vested with broad discretionary powers in determining the qualifications of jurors and that its exercise of discretion will ordinarily not be disturbed on appeal." *State v. Jackson,* 43 *N.J.* 148, 160, 203 *A.*2d 1 (1964), *cert. denied,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965). That deference has a common sense basis: "Trial courts conducting *voir dire* are best able to evaluate the credibility and sincerity of a prospective juror in a way that the record will never allow." *State v. Fortin,* 178 *N.J.* 540, 629, 843 *A.*2d 974 (2004). We have explained the governing principle thusly: "Of necessity, a

sound measure of discretion must be reposed in our trial courts to determine whether a given juror can well and truly discharge the grave responsibility entrusted or whether the juror's views on the death penalty would prevent or substantially interfere with the performance of that duty." *State v. Ramseur,* 106 *N.J.* 123, 256–57, 524 *A.2d* 188 (1987). *Accord State v. Josephs,* 174 *N.J.* 44, 104, 803 *A.2d* 1074 (2002); *State v. Papasavvas,* 163 *N.J.* 565, 595, 751 *A.2d* 40 (2000) (noting that "[i]t has also been observed that this Court is 'perhaps too far removed' from the realities of the *voir dire* to appreciate the nuances concealed by a 'bloodless record'; therefore deference to the trial court is usually prudent" (citation omitted)).

Against that backdrop, the majority's lack of confidence in the fairness of defendant's trial simply is not based on the clear findings in the record. The trial judge—an able, experienced and discerning judge—was in the best position to judge whether the juror was biased or predisposed towards guilt. Having had the opportunity to observe and question the juror, she satisfied herself that in fact the juror was not predisposed. Thus, one of the required logical underpinnings for the majority's analysis is simply missing: the now-challenged juror was not predisposed in respect of defendant's guilt and, thus, he could not have contaminated the remainder of the jury. Any presumption that reaches a different result is in error.

Furthermore, as a practical matter, the questioned juror did not deliberate on defendant's guilt. As the majority recognizes, in an abundance of caution and "without objection from counsel, the trial judge determined that [the questioned juror] would be designated as an alternate juror, removing any possibility that [the questioned juror] would sit as a deliberating juror." *Ante* at 185, 922 *A.2d* at 1217–18 (footnote omitted). Yet, despite those prophylactic measures, the majority nonetheless presumes both predisposition and taint of his fellow jurors, a presumption that is

unwarranted in this record. We are better guided by our long-standing rule:

> No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict. We say "possibility" and not "certainty," for if it were certain that the error led to an unjust result, the reviewing court would be constrained to order the just result, which, on that hypothesis, would be an acquittal, except in the unusual case in which it could be said the error prevented the trier of facts from even reaching the merits. So, too, a "probability" that the error resulted in a false verdict should, if it were the standard for intervention, drive the appellate court to order the judgment which the jury "probably" would have reached but for that error. And since a reviewing court could rarely say an error either certainly or probably induced a false verdict, either test would disadvantage a defendant. Defendants fare better if a new trial may be ordered upon a "possibility" of injustice. Still, not "any" possibility can be enough for a rerun of the trial. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.
> [*State v. Macon,* 57 *N.J.* 325, 335–36, 273 *A.*2d 1 (1971).]

Because, on this record, it cannot be said that the unsubstantiated and rejected "possibility" of a non-deliberating juror's predisposition somehow tainted those jurors who did deliberate and convict defendant, I cannot join the majority. Instead, I would affirm the judgment of the trial court denying defendant's application for post-conviction relief.

## II.

Even if one were to agree with the majority that the events surrounding the retention of the questioned but non-deliberating juror somehow required some species of relief—a proposition that escaped defendant's experienced trial counsel or appellate counsel, as the issue was not raised in either post-trial motions or defendant's direct appeal, as well as this Court in its plenary review of defendant's conviction and sentence—the remedy the majority affords is needlessly overbroad. Explaining that "a remand to conduct a jury voir dire is not a feasible remedy[,]" the majority asserts that "[n]ow, almost thirteen years have passed since defendant's guilt-phase trial" and that "[t]o reconvene the guilt-phase jury at this time, however appealing it may seem, is not practicable." *Ante* at 199–200, 922 *A.*2d at 1226. According to the majority,

Even assuming that all the jurors are still alive and have not suffered an illness or condition that has affected their cognitive abilities, after the passage of so many years, we would have little faith that juror interviews could produce reliable recollections sufficient to satisfy us to uphold a death sentence. The recollection of the most dutiful and honorable juror, however seemingly certain, will be fraught with the potential for error because of the possibility that in the intervening years even important words exchanged between jurors have been forgotten. We can demand only so much of human memory, with all its known frailties, in attempting to reconstruct long ago proceedings, and therefore caution must be our guide when the stakes are so high. We must have a high degree of confidence in the results of a proceeding affirming a death sentence. That level of confidence will never be reached from juror interviews at this late date. However reluctantly we make this concession, we do so in the interest of justice.

[*Ante* at 200, 922 *A*.2d at 1226.]

The logic of that reasoning is overshadowed by its irony. If the passage of time alone renders it somehow unfair to remand the matter for a hearing on whether the questioned juror was predisposed and, if so, whether that predisposition tainted the jury, how can it be any less unfair to require an entirely new death penalty trial, one covering events that are older than those which occurred at the trial, and yet still have confidence in the outcome as sought by the majority? The question, of course, is rhetorical; no answer is expected of it.[6]

A far better procedure—a remand to voir dire the jury as a whole—is both available and not revolutionary. We have explained that

[w]here the court concludes there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of jury, it should conduct a *voir dire* to determine whether any exposure has occurred. If there is any indication of such exposure or knowledge of extrajudicial information, the court should question those jurors individually in order to determine precisely what was learned, and establish whether they are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court.

[6] Indeed, as a practical matter, it could well be said that because jury service on a capital case is so unique and so taxing, it leaves an indelible impression on those jurors who served; few life experiences match up to the task of weighing another's guilt when the ultimate penalty may be death. For that reason, I am far less sanguine than the majority concerning the ability to fairly and impartially question this jury on the issue of taint even at this time.

[*State v. Bey*, 112 *N.J.* 45, 86–87, 548 *A.*2d 846 (1988) (footnotes omitted).]

The procedure to be followed in those instances also is well-settled:

> The court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby. The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary. The decision to grant a new trial based on jury taint resides in the discretion of the trial court[.]

[*State v. R.D.*, 169 *N.J.* 551, 558, 781 *A.*2d 37 (2001) (citations omitted).]

Standing alone, the passage of time is insufficient to justify jettisoning either a lengthy guilt-phase and penalty-phase trial, extensive appeals or the significant efforts expended on post-conviction relief proceedings. Juxtaposed against the expansive nature of the relief granted by the majority, a limited remand of the type proposed here is neither novel nor outside the heartland of what trial courts do everyday. Specifically, in New Jersey, post-trial limited remands have been ordered and used successfully in the past. *See State v. Bisaccia*, 319 *N.J.Super.* 1, 16–20, 724 *A.*2d 836 (App.Div.1999) (holding that "the mere passage of time should not by itself preclude a remand" and remanding, six years after guilty verdicts, to determine whether hearing is feasible and, if so, extent of jury taint), *appeal after remand sub nom. State v. De Stefano*, 339 *N.J.Super.* 153, 771 *A.*2d 592 (App.Div.2001); *State v. Reevey*, 159 *N.J.Super.* 130, 135, 387 *A.*2d 381 (App.Div.), *certif. denied*, 79 *N.J.* 471, 401 *A.*2d 228 (1978) (remanding for "hearing concerning the allegation that juror ... was sleeping during all or part of the summations and charge").

Similar limited remands have been used in the federal courts. *Porter v. Illinois*, 479 *U.S.* 898, 900, 107 *S.Ct.* 298, 299, 93 *L.Ed.*2d 272, 274 (1986) (Marshall, J. dissenting) (stating that "[w]hen a substantial question of juror bias is presented to the trial court, as it was in this case, we have held that the defendant is entitled to a hearing with all interested parties permitted to participate" (citations and internal quotation marks omitted)); *Rushen v. Spain*, 464 *U.S.* 114, 120, 104 *S.Ct.* 453, 456, 78 *L.Ed.*2d 267, 274 (1983) (per curiam) (noting that, in matters concerning juror taint,

"[p]ost-trial hearings are adequately tailored to this task"); *Smith v. Phillips,* 455 *U.S.* 209, 222, 102 *S.Ct.* 940, 948, 71 *L.Ed.*2d 78, 89 (1982) (O'Connor, J., concurring) (explaining that, on remand, "[a] hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case"); *Remmer v. United States,* 347 *U.S.* 227, 74 *S.Ct.* 450, 98 *L.Ed.* 654 (1954); *United States v. Herndon,* 156 *F.*3d 629 (6th Cir.1998); *United States v. Angulo,* 4 *F.*3d 843 (9th Cir.1993).

In the final analysis, "questioning jurors after a trial is 'an extraordinary procedure' that should be invoked only when there is a strong representation that a defendant may have been harmed by juror misconduct." *State v. Harris,* 156 *N.J.* 122, 154, 716 *A.*2d 458 (1998). It is viewed as "an extraordinary procedure" because

due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case.

[*Smith v. Phillips, supra,* 455 *U.S.* at 217, 102 *S.Ct.* at 946, 71 *L.Ed.*2d at 86 (footnote omitted).]

We do less harm if we approach defendant's claims of ineffective assistance of counsel in a measured way. For that reason, if we were to conclude, as the majority does, that defendant's trial and appellate counsel were constitutionally ineffective in respect of the retention of the non-deliberating juror, then the better approach would be to remand the cause to the same trial judge to conduct a fuller hearing.[7]

---

[7] The trial judge remains on the bench; she is currently assigned to the Appellate Division. That assignment should not prevent her from presiding over a limited remand in this case.

### III.

In my view, the majority's conclusions are without foundation in the record and the remedy it orders is not appropriately tailored to the harm the majority purports to address. Therefore, I respectfully dissent.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For affirmance*—Justice RIVERA-SOTO—1.